UNITED STATES of America,
Plaintiff-Appellee,

v.

George Raymond WRIGHT,
Defendant-Appellant.

No. 80–1767.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1981.

Decided Feb. 8, 1982.

Donald Marks, Marks & Brooklier, Beverly Hills, Cal., argued, for defendant-appellant; Anthony P. Brooklier, Beverly Hills, Cal., on brief.

Eric L. Dobberteen, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before HUG, FARRIS, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

George Raymond Wright was convicted of tax evasion in violation of 26 U.S.C. § 7201. On appeal[1] he contends that the trial court erred: (1) in denying his motion to dismiss the indictment because of an allegedly erroneous instruction to the grand jury; (2) in denying his motion to suppress evidence obtained pursuant to a warrant authorizing search for a false driver's license because a state drug enforcement officer participated in the search; (3) in denying a motion to suppress a black ledger because it was not "plain view" evidence of a crime; and (4) in admitting evidence of narcotics activity because its prejudicial effect outweighed its probative value. We conclude that it was error not to grant the motion to suppress the black ledger, but that Wright's other contentions lack merit.

## FACTS

Special Agent Kelly of the Federal Bureau of Alcohol, Tobacco and Firearms (ATF) executed a federal search warrant that authorized the seizure of a California driver's license issued to a "Deborah Luckie" who was believed to be sharing the searched residence with Wright. The license was sought as evidence of alleged federal firearm violations by Ms. Luckie.

The day before executing the warrant Kelly requested the assistance of California Bureau of Narcotics Enforcement Investigator Frantzman. Frantzman had been participating in a large-scale federal narcotics conspiracy investigation involving Wright and others. Kelly invited Frantzman because Wright had a reputation as a major narcotics dealer and Frantzman could provide expertise in narcotics-related matters.

Kelly conducted the search while other agents helped maintain control of the evidence and the premises. While searching for the driver's license in the master bedroom, Kelly found and seized a .38 caliber revolver under the mattress on Wright's side of the bed. Kelly knew that Wright was a convicted felon.

Kelly also found a small black ledger. Apparently he looked through it without finding the license which was the subject of the search. Because of the possibility that it might involve drug trafficking, he brought the book to Frantzman. Frantzman inspected the contents of the book and concluded that it contained narcotics notations. Consequently, the ledger was seized, as were other items including a drum of mannitol[2] and approximately $7,000 in cash.

Kelly found the driver's license without searching every room in the house. Following that discovery the search ended.

Some of the receipts and other documents seized by Kelly during the search were turned over to the Internal Revenue Service (IRS) which was investigating Wright's income tax liability. The results of the IRS investigation were later presented to a federal grand jury, which also received instructions concerning the complex net worth method of calculating taxable income. The grand jury returned a three-count indictment against Wright for tax evasion.

At trial, the Government used the net worth method of proof to establish its case and introduced into evidence the black ledg-

1. This court had heard two other appeals arising out of the search which is the subject of this appeal. By memorandum decision in appeal number 77–1980, involving Wright's conviction for being a felon in possession of a firearm, a panel of this court held that this search was not invalid as generally exploratory for items not described in the search warrant, nor was it conducted in bad faith. The seizure of a revolver found under a mattress was held to be valid under the "plain view" doctrine. The presence of a state narcotics officer was held not, in and of itself, to demonstrate that the agents searched the residence in order to seize narcotics. The panel further held that there was no obligation to ask for the driver's license before commencing the search. While a memorandum decision has no precedential significance, we are bound by the holdings as res judicata to the extent that they apply to the issues of this appeal. The other appeal has no bearing on the present case.

2. Mannitol is a nutrient that has a number of legal uses, but is also used in the drug trade as a "cutting agent" for cocaine or heroin.

er, the drum of mannitol, and Frantzman's testimony concerning the $7,000 in currency. The Government argued that the evidence supported the inference that Wright's likely source of taxable income was his sale of narcotics. Wright was convicted.

## ANALYSIS

### I

### Validity of the Grand Jury Indictment

Wright claims that his conviction must be reversed because his indictment was returned by a grand jury which had been erroneously instructed on a material aspect of the law. Specifically, Wright contends that the prosecutor told the grand jury that it could infer that an increase in net worth was attributable to taxable income which should have been reported. Wright argues that this was erroneous under *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) in that the Government must prove that an increase in net worth was derived from a likely source of taxable income. Wright concedes that the grand jury was exposed to the correct criteria by an expert witness, but contends there is a significant distinction between being instructed by the prosecutor and being informed by a government witness.

■ Erroneous grand jury instructions do not automatically invalidate an otherwise proper grand jury indictment. *See United States v. Linetsky*, 533 F.2d 192, 200–201 (5th Cir. 1976). In this Circuit, a grand jury indictment will not be dismissed unless the record shows that the conduct of the prosecuting attorney was flagrant to the point that the grand jury was "deceived" in some significant way. *United States v. Cederquist*, 641 F.2d 1347, 1352–53 (9th Cir. 1981). The conduct must significantly infringe upon the ability of the grand jury to exercise independent judgment. *Id.*

■ The grand jury which indicted Wright was thoroughly informed about the effects of non-taxable income, the permissible presumptions and inferences that it could draw from the evidence, and all the elements of the case the Government had to prove, albeit, in part through the testimony of a government expert witness.[3]

Assuming arguendo that the prosecutor's instruction was erroneous, we conclude that the prosecutor's conduct did not significantly infringe on the ability of the grand jury to exercise its independent judgment. *United States v. Cederquist*, 641 F.2d at 1353. We hold that the grand jury was not "overreached or deceived in some significant way," *United States v. Thompson*, 576 F.2d 784, 786 (9th Cir. 1978), and that the trial court did not err in denying the motion to dismiss the indictment.

### II

### State Drug Officer's Participation in Search

Wright contends that mannitol was not properly seized as being in "plain view." The plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) creates a three-fold requirement for "plain view" evidence: that the seizing officer have a prior independent justification for being present at the point of observation; that he immediately recognize the item as evidence; and that he discover the evidence inadvertently. Wright contends that officer Frantzman, who discovered and seized the mannitol, had no independent justification for being present. In a prior memorandum decision, a panel of this court held that Kelly and the other agents did not employ the search warrant as a ruse to search generally for incriminating evidence apart from the driver's license. *See* note 1 *supra*. That holding binds us under the doctrine of res judicata.

**3.** Wright cites some language from *United States v. Sousley*, 453 F.Supp. 754, 758 n.1 (W.D.Miss.1978), which dealt with prosecutorial misstatements to a grand jury that supposedly served as the basis for dismissing the indictment. That case, however, was actually decided on double jeopardy grounds.

■ It is clear that an officer executing a search warrant may utilize the assistance of other law enforcement officers. A search warrant may be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such a warrant, but by no other person "except in aid of the officer on his requiring it, he being present and acting in its execution." 18 U.S.C. § 3105.

■ Kelly, who was present and acting in execution of the warrant required Frantzman to act as an aide. Frantzman thus had an independent justification for being in the residence when he discovered the mannitol in plain view. In *United States v. Hare*, 589 F.2d 1291, 1296–1298 (6th Cir. 1979) the court upheld the seizure of narcotics and other evidence by drug enforcement agents accompanying ATF agents in the execution of a search warrant for guns. The court relied on the authority of ATF agents to authorize others to assist in the execution of a search warrant. In addition, the court referred to the independent authority of federal drug enforcement agents to execute federal search warrants. *Id.* at 1298. Assuming as we must that the presence of Frantzman was not in bad faith, there can be no material distinction based on his being a state rather than a federal drug enforcement officer aiding in the search. *See United States v. Cox*, 462 F.2d 1293, 1306 (8th Cir. 1972) *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1971) (upholding a search conducted by two Federal Bureau of Narcotics agents assisted by two city policemen).

### III

### Seizure of the Black Ledger

■ The government justifies the seizure of the 5″ by 8″ black ledger book on the grounds that it was evidence of criminal conduct found in plain view. The plurality opinion in *Coolidge* summarized the requirements for a plain view seizure.

What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, *the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them*; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

403 U.S. at 466, 91 S.Ct. at 2038 (emphasis added). Justice Stewart explained that the "immediately apparent" limitation to the plain view doctrine was necessarily derived from one of the policies underlying the warrant requirement.

The second, distinct objective [of the warrant requirement] is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the "general warrant" abhorred by the colonists, and the problem is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings. See, *e.g., Boyd v. United States*, 116 U.S., [616] at 624–630 [6 S.Ct. 524 at 528–532, 29 L.Ed. 746]; *Marron v. United States*, 275 U.S. 192, 195–196 [48 S.Ct. 74, 75–76, 72 L.Ed. 231]; *Stanford v. Texas*, 379 U.S. 476 [85 S.Ct. 506, 13 L.Ed.2d 431]. The warrant accomplishes this second objective by requiring a "particular description" of the things to be seized.

*Id.* at 467, 91 S.Ct. at 2038. To assure that warranted searches do not result in "exploratory rummaging," the plain view doctrine limits the right of seizure to items, the incriminating nature of which is immediately apparent to the searching officer.

The incriminating nature of an item, however, may not be immediately apparent without a closer inspection of the item. This raises the issue: when may an officer

minutely inspect an item found in plain view to determine whether it is evidence of a crime?[4] The cases indicate that an officer may conduct such an examination if he at least has a "reasonable suspicion" to believe that the discovered item is evidence.[5] Professor LaFave summarizes the requirement for inspection of an item not specified in a warrant as follows:

[E]ven "mere inspection" of items seen but not named in the warrant must be reasonable, and for such a minimal intrusion to be reasonable the officers must first be aware of some facts and circumstances which justify a reasonable suspicion (not probable cause) that the items are the fruits, instrumentalities, or evidence of crime.

2 W. LaFave, *Search and Seizure* § 4.11, at 174 (1978).

An officer cannot inspect or examine every item that falls within his vision while executing a valid search warrant without contravening the constitutional prohibition against "exploratory rummaging." Upholding such unrestrained searches would emasculate the protection afforded by the warrant requirement. Officers, armed with a warrant to search for one item could turn their searches into scavenger hunts for other items, for which the officers could not have established probable cause to search.

Justice Stewart impugned such unrestrained searches in *Stanley v. Georgia*, 394 U.S. 557, 569–572, 89 S.Ct. 1243, 1250–1251, 22 L.Ed.2d 542 (1969) (Stewart, J., concurring in the result; joined by Brennan, J., and White, J.). In *Stanley*, officers had come across a motion picture film while executing a search warrant authorizing seizure of "equipment, records, and other material used in or derived from an illegal wagering business." *Id.* at 570, 89 S.Ct. at 1250. Justice Stewart noted:

This is not a case where agents in the course of a lawful search came upon contraband, criminal activity, or criminal evidence in plain view. For the record makes clear that the contents of films could not be determined by mere inspection . . . . After finding them, the agents spent some 50 minutes exhibiting them by means of the appellant's projector in another upstairs room. . . .

. . . To condone what happened here is to invite a government official to use a seemingly precise and legal warrant only as a ticket to get into a man's home, and, once inside, to launch forth upon unconfined searches and indiscriminate seizures as if armed with all the unbridled and illegal power of a general warrant.

*Id.* at 571–72, 89 S.Ct. at 1251 (footnote omitted).

In *Anderson v. State*, 555 P.2d 251 (Alaska 1976), the court relied on *Stanley* in ruling inadmissible evidence that an officer, while executing a warrant to search for drugs discovered by removing film slides from a box, holding them to a light, and viewing them. In *State v. Shinault*, 120 Ariz. 213, 584 P.2d 1204 (Ariz.App.1978), the facts of which resemble those now before us, the court ruled inadmissable a "closed columnar pad" and the ledger it contained.

We do not conceive how the officers, when confronted with a common colum-

---

**4.** In *United States v. Chesher*, 654 F.2d 1285, 1292–93 n.7 (9th Cir. 1981), we recognized that it is occasionally necessary to peruse an item to determine whether an item is evidence of a crime.

**5.** *See United States v. Ochs*, 595 F.2d 1247, 1258 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979) (discussing the "highly suspicious" nature of two bankbooks and two notebooks as justifying their perusal); *United States v. Duckett*, 583 F.2d 1309, 1313 (5th Cir. 1978) (officer knew "that something was amiss" when he seized envelopes found in Duckett's car while searching for the vehicle

identification number); *United States v. Hamilton*, 328 F.Supp. 1219 (D.Del.1971) (officer knew gun was evidence of a crime upon seeing that it was without a serial number); and *People v. De La Fuente*, 92 Ill.App.3d 525, 47 Ill. Dec. 239, 414 N.E.2d 1355, 1359 (1981) (officer had "reasonable belief" that wallet contained evidence of criminal activity). *See also United States v. Chesher*, 654 F.2d 1285, 1292–93 (9th Cir. 1981), in which we upheld the plain view seizure of a drug laboratory not described in the search warrant because the police had probable cause to believe it to be evidence of crime.

nar pad, without any notation on its cover, could reasonably have concluded that its contents would reveal a connection to the narcotics and firearms lawfully sought.

*Id.* at 1206. In *Commonwealth v. Bowers*, 217 Pa.Super. 317, 274 A.2d 546 (1970), the court ruled inadmissible a television serial number, discovered when a TV repairman disassembled the set, because the television set was not an item named in the warrant and the serial number was not in "plain view."[6]

■ In light of what has been said, it is apparent that the Government's "plain view" argument must fail. We recognize that Kelly, upon finding the ledger, was justified in inspecting it to determine whether the license that was the subject of the warrant was hidden there. To check the ledger for the license, however, did not require the perusal of the ledger's written contents. Moreover, nothing about the ledger, its whereabouts[7] or contents immediately indicated to Kelly that the ledger contained evidence of a crime.[8] Indeed, Kelly's testimony did not include any facts that would give rise to a reasonable suspicion that the ledger was evidence of a crime. Consequently, Kelly exceeded his authority to search for the license when he took the ledger to Frantzman so that he could inspect its contents. Similarly, Frantzman had no right to read the ledger's entries. The incriminating nature of the ledger was not "immediately apparent" to Frantzman but was revealed only after he carefully examined its contents.

If it were permissible to inspect the contents of the ledger, officers acting under a search warrant for any specific item would be empowered to inspect minutely diaries, letters, films and all matter of private materials unrelated to the authorized scope of the search. To permit this type of conduct under the cloak of the plain view exception would be tantamount to enlarging the scope of any search to that of the " 'general warrant' abhorred by the colonists." The Constitution protects against such intrusions. We hold that the trial court erred in failing to suppress the evidence of the black ledger.

IV

Admission of the Evidence to Establish
Likely Source of Taxable Income

Wright's last contention is that, even if properly discovered, the narcotics evidence was inadmissable in his tax evasion trial as being more prejudicial than probative.

■ The Government may present evidence in a tax evasion case to support the

6. *See also State v. Turkal*, 93 N.M. 248, 599 P.2d 1045 (1979) (contents of tapes not in plain view because incriminating nature could not be determined without listening to them); *State v. Murray*, 84 Wash.2d 527, 527 P.2d 1303 (1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) (television serial numbers not within plain view because officers had to tilt the sets to find the numbers and nothing about the location of the sets "looked incongruous" enough to satisfy the "immediately apparent" requirement). *But cf. State v. Sagner*, 12 Or.App. 459, 506 P.2d 510 (1973) (upholding plain view seizure of television with missing serial number because circumstances, apart from the location and appearance of the television, made it "inherently suspicious").

7. In *United States v. Damitz*, 495 F.2d 50, 56 (9th Cir. 1974), we upheld the seizure of a small notebook lying next to small scales and found after the discovery of marijuana bricks during a warranted search for "marijuana together with paraphernalia for packaging marijuana." In doing so, we applied the plain view doctrine even though the officer ascertained the incriminating nature of the notebook only upon examining the notations it contained. The *Damitz* warrant was for drugs and the notebook was found on the counter next to scales commonly used in connection with drug sales. Arguably there was probable cause to believe the notebook contained criminal evidence because of its location next to drug paraphernalia and the prior discovery of marijuana bricks. Moreover, the notebook was related to the general purpose of the authorized search. The case before us is clearly distinguishable. First, the Wright ledger was not found in close proximity to other incriminating evidence. Second, the Wright warrant authorized a search for a driver's license, not for evidence of narcotics activity.

8. Kelly's testimony was very general, indicating that when he came across items "that I thought may be involved in other violations of the law" he would refer them to Frantzman.

inference that an increase in net worth is attributable to currently taxable income. *Holland v. United States,* 348 U.S. 121, 137–38, 75 S.Ct. 127, 136–137, 99 L.Ed. 150 (1954). In the present case, the ledger and drug related evidence are relevant to show Wright's possible involvement in the drug trade as a likely source of taxable income.

■■■ The trial court can exclude relevant evidence if it finds that the prejudicial effect of admitting the evidence outweighs its probative value. Fed.R.Evid. 403. The trial court, however, has wide discretion in determining the admissibility of evidence, *United States v. Martin,* 599 F.2d 880, 889 (9th Cir. 1979), and its determination will not be overturned absent an abuse of discretion. *United States v. Kearney,* 560 F.2d 1358, 1369 (9th Cir.), *cert. denied,* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977).

Wright argues that *United States v. Hall,* 650 F.2d 994, 997 (9th Cir. 1981), supposedly affords "special protections for the accused and particularly careful scrutiny by the courts" in a net worth case. Wright's reliance on *Hall* is misplaced. *Hall* involved prejudice caused by the court's omission of key jury instructions; it had nothing to do with the trial court's weighing of probative value and prejudicial effect of evidence. In this case, the challenged evidence was sufficiently probative that the trial court cannot be deemed to have abused its discretion in admitting it.

■■■ Wright's final and somewhat related contention is that the testimony concerning his connection with the drug trade was too speculative to be of any value. This argument goes to the weight of the evidence, not to its admissibility. We hold that the court did not err in admitting the evidence, other than the black ledger.

## CONCLUSION

Because it was error to admit the black ledger into evidence we find it necessary to reverse Wright's conviction and to remand for a new trial.

REVERSED AND REMANDED.