**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NATIONAL CAR RENTAL SYSTEM, INC., Respondent.**

No: 81–1180.

United States Court of Appeals, Third Circuit.

Argued Nov. 10, 1981.

Decided Feb. 18, 1982.

Rehearing and Rehearing In Banc Denied June 24, 1982.

17. We note our appreciation of the able and helpful brief filed by the amicus curiae at the request of the court.

Victoria A. Higman (argued), Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

John J. Rizzo (argued), Carmine A. Iannaccone, Stryker, Tams & Dill, Newark, N. J., for respondent.

Before SEITZ, Chief Judge, GARTH, Circuit Judge, and POLLAK *, District Judge.

## OPINION OF THE COURT

SEITZ, Chief Judge.

The National Labor Relations Board (Board) applies for enforcement of an order directing National Car Rental System, Inc., to cease and desist from restraining or coercing employees in the exercise of rights protected by section 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1976), and to take certain actions to remedy National's violations of the Act. This court has jurisdiction under 29 U.S.C. § 160(e) (1976).

I.

For more than ten years National operated a truck leasing and renting facility in Newark, New Jersey. A unit of mechanics and garagemen, represented by Local Union 723, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, staffed the facility. Because of limitations on the physical plant at Newark, National began in 1975 to look for a second New Jersey facility. In early 1977, National located a site in Edison, New

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Jersey, twenty miles southwest of the Newark location.

In June 1977, at National's corporate headquarters in Minneapolis, there was a meeting of its Newark manager, its general manager, and its director of truck operations. They discussed staffing at Edison, which was to be operated as a satellite of the Newark facility. National's Newark manager recommended a slight reduction in the number of rental and lease trucks that would operate out of Newark, proposed the number of vehicles that should be obtained to operate out of Edison, and recommended the transfer of several unit and nonunit employees from Newark to Edison. Most of the Newark manager's suggestions were approved, but National's general manager did not approve the transfer of unit employees to Edison, stating that National's president did not want a union at Edison.

National originally planned to open the Edison facility in the summer of 1977, but delays pushed back the opening date. In late 1977, a representative of another truck leasing corporation inquired about the possibility of purchasing some of the lease accounts that National serviced at the Newark facility. National received two other inquiries, including one from Champion Truck Rentals, Inc., on January 12, 1978. Champion offered to purchase all the Newark accounts and lease trucks, an offer that National seriously considered because the Newark operation had been steadily losing money. By the beginning of February, National expected to sell most of the Newark accounts and lease trucks. Champion submitted a written sales agreement on February 17, which National accepted and signed on February 22. The agreement provided that Champion would sublease the Newark facility beginning February 26, and purchase 22 of the 26 lease accounts and most of the lease trucks. The agreement also provided that National would discharge or reassign all its Newark employees before February 26.

On February 22, National told four nonunit employees who worked at Newark that they were to be transferred to Edison. The next day, Newark manager Monusky called a meeting of the thirteen members of Local 723 and told them that they would be discharged three days later. Some of the employees asked about being transferred to Edison, but Monusky replied that such a transfer would be impossible. National also discharged three nonunit employees as of February 25.

Some employees and Local 723 president Sal Zingone knew before February 22 that changes were in the air. First, employees had told Zingone of rumors of the opening of the Edison facility some months earlier. They told him it would be nonunion. Second, near the end of December 1977, the Newark manager told Zingone that National was considering a move, possibly to Edison. No details were discussed. Third, the Newark service manager warned some employees in December and January that their jobs were in danger. Fourth, a representative of Champion talked to some employees in late January and early February about working for Champion. Indeed, in early February the Champion representative offered mechanic Clifton Beard a job.

Zingone was not formally notified of National's move to Edison until February 22, when National's vice president for personnel and labor relations, Kenneth Sanville, called Zingone and told him that National was closing the Newark facility, and that all the union members would be discharged. Zingone said he wanted to check whether National's action was legal. He said nothing about the possibility of bargaining. Zingone called Sanville the next day, said he thought that National had acted illegally, and that he would file unfair labor practice charges. Again bargaining was not discussed. Later that day, Zingone filed an unfair labor practice charge against National.

On February 26, National ceased to operate the Newark facility, and opened the Edison facility. It had seven employees, three of whom were garagemen or mechanics. None was a member of Local 723 or any other union.

A month later Local 723 filed a second unfair labor practice charge that in substance made the same allegations as the one filed February 23. The Board's regional director issued a complaint charging that National violated section 8(a)(1), (3) & (5) of the Act. 29 U.S.C. § 158(a)(1), (3) & (5) (1976). After a hearing, an administrative law judge (ALJ) issued an opinion finding that National had violated section 8(a)(1) & (3), but not section 8(a)(5), and recommended an appropriate remedial order. The Board affirmed the ALJ's finding of a section 8(a)(1) & (3) violation, and also found that National had violated section 8(a)(1) & (5) by refusing to bargain over the effects of its move. The Board modified the recommended order accordingly. *National Car Rental System, Inc.*, 252 N.L.R.B. 159 (1980). The Board has applied for enforcement of its order.

## II.

The Board makes three arguments in this court: (1) that the finding of a section 8(a)(1) & (3) violation is supported by substantial evidence; (2) that the finding of a section 8(a)(1) & (5) violation is supported by substantial evidence; and (3) that the Board's order was an appropriate exercise of its remedial discretion. We consider these issues in turn.

## A.

 This court must accept as conclusive findings of the Board that are supported by substantial evidence considered on the record as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–91, 71 S.Ct. 456, 463–66, 95 L.Ed. 456 (1951).

To find a violation of section 8(a)(3), which states that "[i]t shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization," the Board must first find that National engaged in conduct in the staffing of the Edison facility that discriminated against union members in a way that could have adversely affected their employee rights.

Second, that discriminatory conduct constitutes an unfair labor practice if it meets the standards set forth in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967) (emphasis in original):

First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct.

 First, we examine whether substantial evidence supports the Board's finding that National refused to consider the Newark union members for hire at Edison. When, on February 23, the employees found out they were being let go, Newark manager Monusky told the employees who inquired about the possibility of transfer to Edison that they would not be considered. Monusky testified, "I informed [the union employees] that we were going down to Edison." After being asked whether any of the employees had responded to this statement, Monusky answered, "[h]aving them all in my office, as I said, I know some of them inquired about the Edison facility and the possibility of going down to Edison." Monusky further testified that he responded to their inquiries: "I said to them unfortunately there was nothing I could do for them, and that as of three days they would be terminated." Employee Beard testified that the men "asked [Monusky] if they were going to take any of them down there [to Edison], and [Monusky] said no, they weren't going to take any of them, and they asked why." We conclude that substantial evidence supports the finding that National refused to consider the Newark union members for hire at Edison.

National claims the testimony of Monusky and Beard was inadmissible hearsay. Hearings before the Board must comply with the Federal Rules of Evidence "so far as practicable." 29 U.S.C. § 160(b) (1976). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

■ The statements of Monusky and Beard, however, were not offered to prove that any employees wanted to transfer to Edison. They were offered to show that employees asked about transferring. The significance of the statements the employees made "lies solely in the fact that [they] were made, [and] no issue is raised as to the truth of anything asserted." Notes of Advisory Committee on Proposed Rules, Note to Subdivision (c) of Rule 801, *reprinted in* 28 U.S.C. Appendix (1976). The truth of their statements does not depend at all on "the veracity of the out-of-court declarant." C. McCormick, Handbook of the Law of Evidence § 249, at 588 (E. Cleary ed. 1972). The testimony of Monusky and Beard about the employees' statements was not hearsay, was not otherwise challenged, and therefore was properly admitted.

Second, we examine whether the discriminatory conduct meets the *Great Dane* test. National argues that its conduct was neither inherently destructive nor motivated by antiunion animus, as required by *Great Dane,* and that there was a legitimate business justification for its conduct. The Board, relying on *Allied Mills, Inc.,* 218 N.L.R.B. 281, 288–89 (1975) (refusal to allow employees opportunity to transfer is inherently destructive in some circumstances), enf'd, 543 F.2d 417 (D.C.Cir.1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 254 (1977), argues that National's conduct was inherently destructive, and that, in any event, there was substantial evidence of antiunion animus.

■ We need not address the question whether National's conduct was inherently destructive because we think that the following facts constitute the requisite substantial evidence of antiunion animus: (1) National planned from the start to make Edison a nonunion facility; and (2) National did not change this plan after it decided to close the Newark facility. National does not dispute the truth of these facts, but argues that they are not relevant, because it believed that Champion would hire all of its Newark garagemen and mechanics. Champion in fact hired four of them to start work on February 27. National also relies on its harmonious relationship with Local 723 during the entire time that National operated the Newark facility. We believe, however, that the evidence substantially supports the Board's finding that, after the sale of most of the Newark accounts became likely, National flatly refused to consider the transfer of the unionized Newark employees. In conjunction with the numerous earlier expressions that Edison would be nonunion, this is substantial evidence of antiunion animus.

Thus, we conclude that substantial evidence supports the Board's finding that the refusal to consider the Newark employees for transfer violated section 8(a)(1) & (3).

### B.

■ The ALJ found that National did not violate section 8(a)(1) & (5) by failing to bargain over, first, the decision to sell most of the Newark accounts and to close the Newark facility; second, the decision to open the Edison facility and to transfer some Newark accounts there; and third, the effects of these two decisions. The Board affirmed the first two findings, but not the third. It found that the failure to bargain over the effects of the relocation violated section 8(a)(1) & (5). National challenges this finding. Here, too, our review is limited to deciding whether there is substantial evidence on the record considered as a whole to support the Board's finding.

Section 8(a)(5) provides that, "[i]t shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees...."

The parties do not dispute that National had a duty to bargain over the effects of its decision to relocate. *See, e.g., First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 677 n.15, 101 S.Ct. 2573, 2580 n.15, 69 L.Ed.2d 318 (1981), *Electrical Products Division of Midland-Ross Corp. v. NLRB,* 617 F.2d 977, 983 (3d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980). One of the effects over which there was a duty to bargain was whether National would transfer any of Newark's employees to Edison. *See Fraser & Johnston Co. v. NLRB,* 469 F.2d 1259, 1262–63 (9th Cir. 1972).

The parties' arguments center around two interrelated issues: (1) whether Local 723 waived its right to bargain about effects, and (2) whether National notified Local 723 of the decision to relocate at a time and in such a manner that Local 723 could have requested bargaining. The ALJ found that Local 723 waived its right. The Board found that National announced its decision to relocate in such a manner that any request for bargaining would have been futile.

■ National argues that one basis for finding a waiver of the right to bargain over effects was that Local 723 and the employees had known for months that some changes were in the offing. The ALJ relied in part on this prior knowledge: "Zingone had actual notice in late December that [National] was contemplating a move from Newark . . . . [A] request to bargain over effects as well as the decision to relocate would have been appropriate at that time." 252 N.L.R.B. at 173. The Board, however, discounted the effect of any notice that Local 723 or the employees had before February 22. "[P]lant gossip, conjecture and rumors cannot take the place of formal notice when notice is required." *NLRB v. Royal Plating & Polishing Co.,* 350 F.2d 191, 195 (3d Cir. 1965). *Accord, International Ladies' Garment Workers Union v. NLRB,* 463 F.2d 907, 918 (D.C.Cir.1972); *NLRB v. Rapid Bindery, Inc.,* 293 F.2d 170, 176 (2d Cir. 1961). We think the Board was justified in concluding on this record that there

was no legally sufficient notice before vice president Sanville's phone call to Zingone on February 22.

■ The ALJ's second basis for finding a waiver was Zingone's failure to request bargaining over effects when he received the February 22 phone call from Sanville. The Board stated that there was no waiver because

[Local 723] immediately contested the propriety of [National's] precipitous announcement that all unit employees were being terminated, but was told that it had no control in the situation. Had [National] not announced the closing and terminations as a *fait accompli,* it is clear [Local 723] could have offered various proposals, such as transferring the unit employees to Edison. [National's] announcement, however, precluded such a request and clearly indicated that any attempt at bargaining would have been futile.

252 N.L.R.B. at 163. National was under no obligation to seek out the bargaining representative. *See NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 297, 59 S.Ct. 501, 504, 83 L.Ed. 660 (1939). The Board concedes that Local 723 made no request. Thus, National cannot have violated the duty to bargain unless the notice of its plan to relocate was presented to Zingone in such a manner that the notice itself showed a violation.

■ National argues that the Board did not apply the correct principles in concluding that there was no waiver. The Board stated that there was no waiver by Local 723 because National "announced the closing and terminations as a *fait accompli.*" Despite this imprecise language, the Board clearly held that the decision to close the Newark facility was a decision about which National was under no duty to bargain with Local 723. *See* 252 N.L.R.B. at 162–63. The Board was correct. *See First National Maintenance Corp.,* 101 S.Ct. at 2584. National could announce the Newark closing after the decision had already been made.

We also agree with the Board that National's announcement of employee terminations without any reasonable opportunity to bargain about the decision was impermissible. The Supreme Court recently stated:

There is no dispute that the union must be given a significant opportunity to bargain about these matters of job security as part of the "effects" bargaining mandated by § 8(a)(5). And, under § 8(a)(5), [such bargaining] must be conducted in a meaningful manner and at a meaningful time, and the Board may impose sanctions to insure its adequacy.

*Id.* at 2582 (citations omitted).

We find substantial evidence to support the Board's finding that the termination of the employees was announced as a *fait accompli.* The record shows that at the time National announced the closing Local 723 reasonably understood that a request to bargain over matters of job security would be futile. *Cf. ABC Trans-National Transport, Inc. v. NLRB,* 642 F.2d 675, 678–79 n.6 (3d Cir. 1981) (implicitly overruled on other grounds in *First National Maintenance, supra*) ("We find it difficult to understand how the union can be regarded as having waived the right to request bargaining over a decision which had been announced as final.").

Zingone presented evidence in his testimony that:

[Sanville] told me that the Newark location was going to close down, and all the people will be terminated, and given whatever compensation they had coming to them.

. . . .

[When Zingone called back on February 23 to protest National's decision, Sanville's response was] that I should do whatever I had to do, and that perhaps the best thing to do is have the legal departments of both his company and our local tangle [about] that themselves.

Zingone's testimony supports the conclusion that Sanville presented the news of the closing of Newark and of the terminations of the employees in a manner that precluded bargaining, and would have made any request futile.

There is also the following evidence that would support a conclusion that National's decision to terminate the employees had been finally made before it announced the closing. National's vice president Sanville testified that as of February 22:

Q: And the decision not to offer these employees the opportunity to transfer had already been made; hadn't it?

A: That is correct.

. . . .

A: Again, I told [Monusky] I would—I advised him to bring each employee into his office, explain the circumstances behind the shutdown, give them a letter so that it would ease their applying for unemployment compensation.

Sanville's testimony amply supports the Board's conclusion that, at the time he called Local 723 president Zingone on February 22, National had already decided not to bargain about whether the employees could transfer to Edison. Sanville also testified that he thought that at the time he made this phone call some of the mechanics who would work at Edison had already been hired.

We realize that there is evidence in the record that would support the conclusion that National did not foreclose effects bargaining. The testimony about the conversations between Sanville and Zingone could be interpreted more favorably to National. It may be inferred from the ALJ's discussion of whether Local 723 waived its right to bargain over effects that the ALJ did not find National's notice to be a *fait accompli.* However, because the ALJ's apparent finding was colored by his belief that Local 723 should have requested bargaining as early as December 1977, we do not believe that it detracts seriously from the substantiality of the evidence supporting the Board's conclusion. *Cf. Eastern Engineering & Elevator Co. v. NLRB,* 637 F.2d 191, 197–98 (3d Cir. 1980) (discussion of effect of conflict between ALJ and Board on findings of fact that depend on credibility and demeanor of witnesses). Thus, although the issue would

be a difficult one if we had to make the initial findings of fact, we think that there is substantial evidence to support the Board's finding of a section 8(a)(1) & (5) violation.

### C.

The Board, after finding the violations of section 8(a)(1), (3) & (5), issued an order requiring that National cease and desist from refusing to bargain in good faith with Local 723 about the effects of National's sale of accounts and relocation, and from refusing to consider the thirteen Newark employees for hire at Edison because of their membership in Local 723. The order also required National to offer employment at Edison to the thirteen Newark employees, dismiss any current employees if necessary to make jobs available, and pay for any lost earnings caused by the discrimination. National does not challenge these portions of the order. However, it does challenge two additional requirements of the order: (1) that it recognize Local 723 as the exclusive bargaining representative of the garagemen and mechanics at Edison; and (2) that it provide additional backpay in the amount of the employees' normal wages from five days after the Board's decision until National offers to bargain, except that each employee is to receive a minimum of two weeks wages. National argues that these two parts of the order are beyond the broad remedial power that section 10(c) of the Act, 29 U.S.C. § 160(c) (1976), grants to the Board, and therefore constitute an abuse of discretion, *see Detroit Edison Co. v. NLRB*, 440 U.S. 301, 316–17, 99 S.Ct. 1123, 1131–32, 59 L.Ed.2d 333 (1979).

1. *The Recognition and Bargaining Order*

The Board reasoned that National should be required to recognize Local 723 as the exclusive bargaining representative of the garagemen and mechanics at Edison because the Edison facility represented a continuation of the operation at the Newark facility.

While no employees from Newark actually transferred to Edison [when it opened], this result stems directly from [Nation-

al's] systematic discrimination against the Newark employees. Although the record does not indicate the number of employees who would have been willing to transfer, it does show that several of the 13 unit employees from Newark attempted to do so upon notification of their termination, and that others who testified also indicated their desire to accept employment at Edison.... [A] fair inference to be drawn from these facts is that, absent [National's] discrimination, [Local 723] would have retained its majority among [National's] employees....

252 N.L.R.B. at 164. Thus, it is clear that the Board imposed the bargaining order to provide a complete remedy for the section 8(a)(3) violation.

National vigorously opposes the requirement of recognition. Even if we assume that the Board sufficiently articulated its reasons for imposing a bargaining order, and that there is substantial evidence to support the Board's finding that Local 723 would have retained its majority at the Edison facility but for National's unfair labor practice, we think that the imposition of a bargaining order at this point is an abuse of discretion. It is at least premature in view of the fact that the remedial order requires that the thirteen former employees be offered employment at Edison on a seniority basis. If acceptance of this unchallenged remedy should result in a union majority at Edison, there is no evidence that National would not recognize Local 723 as the exclusive bargaining representative for the Edison garagemen and mechanics. It is also possible that the former employees of the Newark facility will not constitute a majority at Edison, even after the other aspects of the Board's remedial order are enforced. Employees not only have the right to bargain collectively, but also to refrain from collective bargaining. *See* 29 U.S.C. § 157 (1976). Thus, the Board's order in this case may impose a bargaining representative on employees who do not wish to be represented. *See Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 45 n.17 (D.C.Cir.1980) (similar order would probably

result in union representation for at least four years).

The Board did not explicitly consider the possibility that its order might impose a bargaining representative on employees who do not wish one. The Board reasoned that, absent National's unfair labor practices, a majority of the Edison employees would have wanted Local 723 to represent them. Not to impose Local 723 as their representative now "would provide [National] with an impermissible windfall." 252 N.L.R.B. at 164 n.26. However, the Board failed to recognize the injustice in imposing a bargaining representative on employees who are perfectly able to decide whether they want one. Here, the present employees are innocent of any wrongdoing, and some or all of them may lose their jobs because of other aspects of the Board's order. We think the injury that might be done to the rights of the current Edison employees by imposing on them a union they may not want is much greater than the injury that will be done by allowing the possibility that National will avoid a unionized work force. *See Fraser & Johnston Co. v. NLRB*, 469 F.2d 1259, 1265 (9th Cir. 1972) (section 8(a)(5) case). *Cf. Peoples Gas System*, 629 F.2d at 45–51 (refusing to enforce recognition and bargaining order after balancing rights of employees against a windfall to the employer). *But cf. Air Express International Corp. v. NLRB*, 659 F.2d 610, 617 (5th Cir. 1981) (Board's bargaining order enforced where employer merged and relocated, and discriminatorily discharged employees because of their membership in newly certified union).

Given the other remedial provisions, we conclude that at this stage the Board's recognition and bargaining order constituted an abuse of its discretion.

### 2. *The Effects Bargaining Order*

■ The Board reasoned that National's section 8(a)(5) violation in refusing to bargain about the effects of the Newark facility's closing would go unremedied unless an order to bargain over effects was accompanied by the restoration of "some measure of economic strength" to the former Newark employees. 252 N.L.R.B. at 164. The Board's complicated remedy essentially gave each of the thirteen at least two weeks of pay, with the possibility of increased compensation if National continued to refuse to bargain.

National claims this remedy is punitive rather than remedial because the order already provides for the recovery of any lost wages. We do not agree that this makes the Board's order punitive. The backpay was provided to remedy the section 8(a)(3) violation. The two weeks' wages were intended to remedy the section 8(a)(5) violation. We think the Board did not abuse its discretion in concluding that a monetary award to the employees was necessary to remedy the section 8(a)(5) violation. We do not think that the compensation is punitive simply because the Board defined the monetary award in terms of the employees' former salaries. Each of the section 8(a)(3) and section 8(a)(5) awards would be within the Board's discretion if made singly, the two violations are separate and distinct, and there is nothing punitive in remedying both violations.

The Board did not abuse its discretion in remedying the section 8(a)(5) violation.

### 3. *Compliance*

■ National also argues that it has complied with the Board's order and that Local 723 has not requested bargaining over the effects of closing. Even assuming this is true, it does not affect our consideration of whether to enforce the Board's order. *See NLRB v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 567, 70 S.Ct. 826, 828, 94 L.Ed. 1067 (1950). Any issues about compliance with the Board's order may be litigated, if necessary, in further proceedings.

### III.

The Board's order, as modified, will be enforced.

GARTH, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's holding that there is substantial evidence to support the

Board's holding that National's conduct in staffing its Edison facility was motivated by an anti-union animus and thus amounted to discrimination against union members. As I read the majority opinion, it is fully consistent with the general principle that an employer's preference that a facility be nonunion does not, without more, give rise to an unfair labor practice: there is no obligation on the part of an employer to invite a union in to seek to represent the employees at a newly opened plant. Section 8(a)(3), however, does prohibit discrimination against present or prospective employees on the basis of union membership, and I agree with the majority that the testimony regarding National's flat refusal to consider the transfer of union members to Edison, in conjunction with National's "numerous earlier expressions that Edison would be nonunion," Majority opinion at 1187, in this case and under the circumstances present here constitutes "such relevant evidence as a reasonable mind might accept as adequate to support [the Board's] conclusion," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951).

I depart from the majority in its disposition of the waiver issue,[1] however, because I believe that the majority has failed to give the findings of the ALJ in this case the weight that they deserve under the decisions of both the Supreme Court and this court. Further, although I agree with the majority that the Board abused its discretion in issuing a bargaining order, I write separately on this issue to call attention to the Board's continuing—and inexcusable—refusal to respect this court's long-standing requirement that the Board articulate specific reasons for issuing a bargaining order.

I.

As the majority notes, the Board reversed the ALJ's finding that the union had waived its right to bargain over the effects of the decision to close the Newark facility and transfer some of the Newark accounts and employees to the new facility in Edison. In doing so, the Board in my opinion erred by not giving proper weight to the ALJ's demeanor and credibility findings.

In *Eastern Engineering & Elevator Co. v. NLRB*, 637 F.2d 191 (3d Cir. 1980), this court reaffirmed the long-standing principle that to the extent that they are based on credibility and demeanor determinations, the findings of an ALJ are to be given great weight in reviewing the question whether a decision of the Board is supported by substantial evidence.[2] In that case, the ALJ had credited the testimony of the company president that an employee had been discharged for legitimate business reasons, and had refused to credit the testimony of the fired employee and a union official that the discharge had resulted from the employee's filing of an internal union charge against a fellow employee. Claiming that its reversal of the ALJ's decision stemmed from a disagreement with the ALJ over ultimate evidentiary inferences and the proper interpretation of the NLRA, the Board overturned the ALJ's factual findings. This court denied enforcement, however, finding that despite its protestations to the contrary, the Board in that case had simply disagreed with the ALJ on credibility and demeanor issues, crediting testimony that the ALJ had found unbelievable and discounting testimony on which the ALJ had relied.

In refusing to enforce the Board's order in *Eastern Engineering*, this court did no more than heed the Supreme Court's admonition in *Universal Camera Corp.* that the "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn

1. As the majority has stated, no issue is presented in this case as to bargaining over the decision to transfer the facilities from Newark to Edison. With respect to the bargaining over the effects, the ALJ found that the union had waived its right.

2. *See also ABC Trans-National Transport, Inc. v. NLRB*, 642 F.2d 675, 683–86 (3d Cir.), *disapproved on other grounds in First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981).

conclusions different from the Board's than when he has reached the same conclusion." 340 U.S. at 496, 71 S.Ct. at 468. Certainly in this case as well the court is faced with a disagreement by the Board with the conclusions of an ALJ who has "observed the witnesses and lived with the case." The hearing before the ALJ took five days, during which the ALJ had ample opportunity to observe firsthand the testimony of all the witnesses who appeared before him. Still, as this court has made clear, the Board is "required to extend some, but not absolute, deference to the ALJ's determinations," *Eastern Engineering*, 637 F.2d at 197; *Universal Camera Corp.*, 340 U.S. at 496, 71 S.Ct. at 468; the weight that the Board must attach to the ALJ's findings in any given case depends on the extent to which credibility and demeanor factors played a role in the ALJ's decision. In this case, it is clear to me that such factors were critical to the ALJ's finding of waiver, and that the Board therefore erred in displacing that finding.

The ALJ gave two reasons for his finding that the union had waived its rights to bargain over the effects of the move to Edison. First, the ALJ found that in December of 1977, union president Zingone had in fact received actual notice of a possible move to Edison, and yet made no efforts to initiate bargaining with National. 252 N.L.R.B. at 173.[3] The Board, on the other hand, found that "[t]he first the Union or the employees heard of the closing of the Newark facility was on February 22, [1978,] simultaneously with the notification that the entire unit was being terminated." *Id.* at 163. Although in so concluding the Board did not give explicit reasons for discounting the finding of actual notice in December, it apparently relied on the general doctrine that "plant gossip, conjecture and rumors cannot take the place of formal notice when notice is required," *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191, 195 (3d Cir. 1965).

It is clear, however, that the Board's disagreement with the ALJ did not stem from a dispute over the correct statement of the legal standard, for the ALJ explicitly noted that a union has "no obligation to request bargaining simply on the basis of shop rumors," 252 N.L.R.B. at 173. Rather, the ALJ found that National's Acting City Manager for Newark had "told Zingone [in December] that [National] was contemplating a move from Newark, possibly to Edison," and that with the rumors of a move as background, the City Manager's December statement gave Zingone "all the notice he needed to conclude that if the Union wished to bargain over the prospective move the time was ripe to request bargaining." *Id.* (footnote omitted). In light of the ALJ's specific factual finding, based on live witness testimony, that the union had actual knowledge in December of a possible move to Edison, I cannot agree that the Board's unsupported assertion that it was not until February 22 that the union learned of the move, is backed by substantial evidence.

The second reason that the ALJ gave for finding a waiver was the union's conduct on February 22, 1978. Specifically, the ALJ found that

[o]n February 22, [National] gave Zingone notice that in 4 days the Newark terminal would close, the Newark employees would be terminated, and the Edison terminal would be opened. Zingone made no request to bargain at that time. On the following day, Zingone called Sanville to say that in his opinion Respondent's actions were illegal and that he intended to file unfair labor practice charges, but he was not specific as to the nature of the claimed illegality and he again made no request to bargain. Although on the same day Zingone filed a charge alleging a refusal to bargain, that charge was never received by Respondent, and it was not until a month later

---

**3.** In making this finding, the ALJ was technically concerned with the question whether the union had waived whatever rights it might have to bargain over National's decision to close the Newark facility and open one in Edi-

son. But the ALJ relied on his finding of waiver in this respect in reaching his conclusion that the union had waived its right to bargain over the *effects* of that decision. *See* 252 N.L. R.B. at 173.

that Respondent learned that the Union charged it with a refusal to bargain. *Id.* In overturning the ALJ's finding of waiver, the Board stated that "the Union *immediately contested* the propriety of [National's] *precipitous* announcement" which was now being made for the first time as a "*fait accompli.*" *Id.* at 163 (emphasis supplied). Once again, the Board's decision amounts to no more than a different reading of evidence that the ALJ, as the one who observed the witnesses and lived with the case, was in a better position to evaluate. The ALJ, as noted, saw nothing "precipitous" in the announcement on February 22, because he found that the union had had actual notice of a contemplated move to Edison as early as the previous December. The immediate, vigorous protest which the Board found Zingone to have made, moreover, was not apparent to the ALJ. Based on the evidence before him, the ALJ found that Zingone did not even protest National's decision on February 22, and that the union did not bring up the issue of refusal to bargain over the effects until a month later. In rejecting the ALJ's finding of waiver, and in making its own findings which are not supported by this record, the Board, then, simply ignored the ALJ's proper fact-finding role.[4]

I respectfully dissent from the majority opinion insofar as it fails to accord the factual findings of the ALJ the weight to which they are entitled in light of his first-hand observation of the witnesses and the evidence.

## II.

The majority holds that the Board abused its discretion in issuing a bargaining order, ruling that in the circumstances of this case the imposition of a bargaining representative on the Edison employees would carry unjustifiably high costs in terms of the employees' right to choose what union, if any, will represent them. I fully agree with this

holding, and add a second, and in my view compelling basis for this court's refusal to enforce the bargaining order: the Board's failure to comply with our clear mandate that it articulate specific reasons why a bargaining order should be issued.

The requirement that the Board consider and specify all the factors leading to its determination that the extraordinary remedy of a bargaining order is appropriate is not only a long-standing one in this and other Circuits;[5] it is also an essential prerequisite to this court's ability effectively to review the Board's bargaining orders. This requirement is one that we have imposed upon the Board, so that we may properly and competently discharge our function as a reviewing authority. Accordingly, even though there may be other grounds for refusing to enforce a bargaining order, we should not overlook the importance of a sufficient elaboration of reasons by the Board because it is primarily to benefit our function of review that this standard has been established. Thus, I strongly believe that in this case the Board's failure to comply with a clearly established requirement, which we have imposed and which is essential to this court's review, furnishes another compelling reason for refusing to enforce the bargaining order.

As early as 1976, this court established a requirement that the Board articulate its reasons for issuing a bargaining order instead of issuing a cease and desist order, calling for a new election, or taking some other appropriate action. *See NLRB v. Armcor Industries,* 535 F.2d 239 (3d Cir. 1976). And as recently as seven months ago, this court, sitting *en banc,* reaffirmed the principle that "when the Board imposes a bargaining order, it must articulate the factors that justify the choice of this remedy over the ordering of a new election." *NLRB v. Permanent Label Corp.,* 657 F.2d 512, 519 (3d Cir. 1981) (en banc). Moreover,

---

4. In upholding the Board's determination, the majority points to testimony of Zingone and National's vice president. *See* Maj. Op., at 1189. Obviously, though, the ALJ gave substantially different credit to the testimony.

5. *See, e.g., Peoples Gas System, Inc. v. NLRB,* 629 F.2d 35, 45–46 & n.18 (D.C.Cir.1980).

the requirement is not peculiar to this court; the First, Second, Fourth, Fifth, Seventh, Ninth, and D.C. Circuits all have adopted a similar requirement. *See NLRB v. Permanent Label,* 657 F.2d at 531 & n.2 (Garth, J., concurring in part and dissenting in part) (collecting cases).

In this case, the Board provided only the most summary of "explanations" of the need for a bargaining order rather than some other remedy:

> We think the facts of this case . . . clearly support a bargaining order. Here Respondent had expressly stated that the Edison facility would be nonunion, although it had decided to transfer non-unit employees from Newark to Edison. Further, it subsequently concealed the decision to transfer operations from Newark to Edison, and rejected inquiries for transfers as soon as unit employees were notified of the Newark closing. Any ambiguity with respect to which and precisely how many of the 13 unit employees would have been rehired for the 4 Edison openings, a matter properly reserved for compliance proceedings, should not serve to relieve Respondent of its ongoing bargaining obligations with respect to unit employees. A fair inference in these circumstances is that the Union would have retained its majority status absent Respondent's wrongdoing. A contrary result would provide Respondent with an impermissible windfall.

252 N.L.R.B. at 164 n.26. To accept this statement as a sufficient articulation of reasons for imposing a bargaining order would amount to an abandonment of the articulation requirement itself. Nowhere does the Board explain why the traditional, and less drastic, remedy of an order to the employer to cease and desist from unfair labor practices would not be sufficient to eliminate the impact of the past unfair practices on the Edison employees' freedom to choose their own bargaining representative.[6] Indeed, indicative of the extent to which the Board's opinion falls short of our articulation requirement is its utter failure to mention, let alone consider and give weight to, the central value the Supreme Court sought to protect in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969): the right of employees, whenever possible, to make their own choice of bargaining representative rather than having one imposed on them by the Board. *See Peoples Gas System, Inc. v. NLRB,* 629 F.2d at 45.

Thus, I concur fully in the majority's refusal to enforce the Board's bargaining order. I would also add as an independent and sufficient basis for doing so the Board's inexcusable and incomprehensible failure to comply with our clearly established requirement that specific reasons be articulated as to why a bargaining order is needed instead of some other remedy less intrusive on the employees' freedom to make their own choice on bargaining representation.

### III.

In sum, I would enforce the Board's remedy only to the extent that it was recommended by the ALJ, who proposed that National be ordered to: (1) cease and desist from its unfair labor practices; (2) offer the former Newark employees the jobs they would have been offered absent the anti-union discrimination, or in the alternative offer them substantially equivalent jobs or place them on a preferential hiring list; and (3) pay to each of the former Newark employees who were refused transfer the amounts they would have earned absent the discriminatory refusal to consider them for employment at Edison, less net earnings. *See* 252 N.L.R.B. at 174–75.

---

**6.** As the majority opinion notes, *see* Maj. Op. at 1190, "there is no evidence that National would not recognize Local 723 as the exclusive bargaining representative for the Edison garage-

men and mechanics" if enough former Newark employees were to accept the offer of employment at Edison to form a union majority.