**FRASER & JOHNSTON COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 71–1438.

United States Court of Appeals,
Ninth Circuit.

Nov. 29, 1972.

Nathan R. Berke (argued), of Severson, Werson, Berke & Melchior, San Francisco, Cal., Joseph R. Grodin, San Francisco, Cal., Phillip J. Smith, Oakland, Cal., Robert LeProhn, San Francisco, Cal., for petitioner.

John H. Ferguson, Atty. (argued), John D. Burgoyne, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter G. Nash, Gen. Counsel, Washington, D. C., Roy O. Hoffman, Director, Region 20, NLRB, San Francisco, Cal., for respondent.

Before WRIGHT and GOODWIN, Circuit Judges, and ANDERSON,* District Judge.

EUGENE A. WRIGHT, Circuit Judge:

Fraser & Johnston Company (hereinafter "the company") has petitioned to review and set aside an order of the National Labor Relations Board, entered on March 22, 1971, pursuant to § 10(c) of the National Labor Relations Act, as amended (29 U.S.C. § 151 et seq.). The Board has filed a cross-application for enforcement of its order, which was reported at 189 NLRB No. 17. This court has jurisdiction over the proceedings under § 10(e) and (f) of the Act, the unfair labor practices having occurred in San Francisco and San Lorenzo, California.

The Board found that the company, which for valid economic reasons moved its plant 26 miles from San Francisco to San Lorenzo, violated § 8(a), (5) and (1) of the Act by refusing to bargain in good faith with certain unions [1] about the effects of this plant relocation on the employees.

The Board also found that the company violated § 8(a)(3), (2) and (1) by

---

* Honorable J. Blaine Anderson, United States District Judge, District of Idaho, sitting by designation.

1. International Association of Machinists and Aerospace Workers, AFL–CIO, Lodge No. 1327 (hereinafter "IAM"); Sheet Metal Production Workers International Association, Local Union No. 355, AFL–CIO (hereinafter "Sheet Metal Workers"); International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers of America, Local 6, AFL–CIO (hereinafter "Boilermakers").

recognizing the International Brotherhood of Electrical Workers (IBEW) as exclusive representative at the relocated plant and by making membership in the IBEW a condition of employment at the relocated plant.

The Board further found that the company's refusal to recognize the unions listed in footnote 1 as bargaining representatives of the employees at the relocated plant was a violation of § 8(a)(5) and (1).

## RELOCATION OF THE COMPANY PLANT.

The company is a California corporation engaged in the business of manufacturing heating and air-conditioning units and equipment. Since 1966 it has been a wholly-owned subsidiary of Westinghouse Electric Corporation.

The company business was operated in San Francisco until July 1969. General inadequacy and condition of the plant facilities indicated that a move was necessary. The company had collective bargaining agreements with five unions, only three of which, the IAM, Sheet Metal Workers, and Boilermakers, are involved in the proceedings here. The unions agreed that a move was necessary.

The company sent to the president of each of the unions a letter in May 1968 warning of the possible relocation. Another letter in June invited the unions to review the relocation plan and to offer suggestions. After many years of harmonious union relationships, the company had contracts with IAM and the Sheet Metal Workers scheduled to expire in March 1971 and a contract with the Boilermakers expiring in June 1971. None of the contracts provided for conditions under which they would be terminated prior to the expiration dates and none had provisions relating to plant relocation.

During June and July 1968 the company indicated to the three unions that if it decided to relocate to San Lorenzo it would move into a building owned and partially occupied by Westinghouse and would "use the people who are presently employed there doing metal fabrication and assembly work and who are covered by the IBEW contract in that location." The company indicated that the San Francisco employees would be terminated and not transferred to the new location. This position was said to have been dictated by the management of Westinghouse which then was under contract with IBEW, at San Lorenzo. Westinghouse informed IBEW that its legal department had advised it was obliged "under the terms of the contract to continue to bargain with IBEW at that plant."

Informed by Westinghouse that the San Francisco unions were contending that they should be permitted to transfer their bargaining rights to San Lorenzo, IBEW responded that it did not understand the basis of the union's claim "because our contract at San Lorenzo specified that we were the bargaining agent for all employees employed at the San Lorenzo plant."

Plans for relocation continued. The company advised the employees that their jobs would be terminated, that the company would do everything possible to help them find new jobs with other employers and that it would continue discussions with the unions concerning severance benefits; further, that the employees now working at San Lorenzo would produce the company's products but added,

"Should openings occur at the new location, a former employee of this plant can apply for a job there, if he so desires. Your application will certainly be considered at San Lorenzo, based on our needs at that time."

Two reasons were given by the company for its refusal to transfer its employees or to continue to bargain with their representatives after the relocation. First, it said it was obliged under the Westinghouse contract with IBEW to honor IBEW's claim to represent all production and maintenance employees at San Lorenzo. Second, the company justified its opposition to transfers by

relying on a survey made by its foremen which indicated that a majority of the San Francisco employees were not interested in transferring to San Lorenzo. The company's chief negotiator told the unions that a majority of the employees lived in San Francisco, that most commuting was done into the central city rather than out of it and that, on the basis of his "experience with other companies," he felt that a number of employees who might initially decide to transfer would subsequently decide not to continue.

The unions countered with the results of a verbal survey by its steward showing that 80 to 85% of its members did want to transfer. The IAM proposed in January 1969 a "joint canvass" of the employees. The company rejected the proposal on the grounds that such a survey would be unreliable and that employees would sign in order to help others who wished to transfer. On April 30 the IAM circulated a petition in the plant among its member employees. Of 116, 93 requested that the company retain them at the new location, stating that they wanted the IAM to continue as their bargaining representative. The company received the petition about May 27, 1969.

The Boilermakers submitted a petition to its members and, of 45 on the seniority list, 35 signed the petition seeking continued employment.

Shop stewards for the Sheet Metal Workers circulated a petition among its 154 employees. Of that number, 120 signed the petition requesting both continued employment and continued representation. When the company was shown the results of the survey and the list, the company negotiator responded that, "It was not his opinion that this was the fact." Anyway, he said, "he had an agreement with the IBEW at the San Lorenzo facility."

Further discussions dealt mostly with severance pay but no agreement was reached. In March 1969 the company began the process of actually moving its equipment to San Lorenzo. In April, about 30 of the Westinghouse employees were released to the company and began working for it. By the end of that month, the company employed about 100 people there, after executing contract supplements with IBEW.[2]

On July 3, 1969, the company terminated the last of its San Francisco employees, some 165 in number. In all material respects—company name, products, machinery, operational methods and supervision—the company's operations in San Lorenzo were a continuation of the operations it had formerly conducted in San Francisco. Wages at the new plant were somewhat lower than those provided for under the San Francisco contract.

After the terminations some 65 San Francisco employees made application at San Lorenzo. Jobs were offered to 49; 33 of those were accepted. Of the rest, two failed to pass their physical examinations, and 14 declined the specific jobs which they were offered. Under the terms of the IBEW contract, those accepting employment were required to tender initiation fees and dues to the IBEW in order to keep their jobs. In addition, they were told they would receive no credit for previous service but would be treated as new employees.

## REFUSAL TO BARGAIN ABOUT TRANSFERS.

■ Substantial evidence supports the Board's finding that the company failed to bargain in good faith over the effects of the relocation on the employees. While the company was under no obligation to accede to the demands of the unions that the employees be transferred with full seniority, union

2. The company had formerly extended recognition to the IBEW on January 20, 1969, at a time when no employees had yet been hired for the San Lorenzo operation.

representation, and other rights, it was required to bargain in good faith over that issue. N.L.R.B. v. Lewis, 246 F.2d 886 (9th Cir. 1957).

The company failed to bargain in good faith in two respects. Had enough of the San Francisco employees transferred to constitute a majority of the appropriate bargaining unit in the new location, the integrity of the previous bargaining unit would have been preserved.[3]

It follows that despite the company's insistent claim that its obligation to the IBEW precluded it from agreeing to transfers, no legal necessity compelled it either to refuse transfers or to treat IBEW as the exclusive representative of all the production and maintenance employees engaged in its relocated operations. The Board, therefore, justifiably inferred that the reasons given for the company's position were not the real reasons. Whatever the company's true reasons might have been, it is clear that adhering to an untenable legal position during the course of negotiations is inconsistent with the obligation to bargain in good faith.

In addition, the company contended that its employees did not want to transfer. However, when faced with union surveys indicating that a large majority of the employees would transfer, the company refused to take further steps to ascertain more accurately their employees' desires. This was inconsistent with their bargaining position and, considered in light of their unreasonable insistence upon their obligation to the IBEW, constituted a refusal to bargain in good faith, in violation of § 8(a)(5).

## RECOGNITION OF IBEW.

As noted, the company extended formal recognition to the IBEW on January 20, 1969. Assuming that the parties contemplated the hiring of the 85 IBEW-represented employees of the to-be-discontinued standard controls division of Westinghouse, it is clear that the parties must have been aware that the bargaining unit involved did not constitute a substantial and representative employee complement, since the actual unit would expand upon the completed transition to embrace more than 300 employees, the number formerly employed in San Francisco.[4]

 Accordingly, the Board properly found that the company rendered unlawful assistance and support to IBEW, in violation of Section 8(a)(2). In addition, since the contract with IBEW contained a union security provision requiring as a condition of employment membership in IBEW and payment to it of initiation fees and monthly dues, the Board correctly concluded that the company violated § 8(a)(3).

 We therefore enforce that part of the Board's order directing the company to sever contractual relations with

3. California Footwear Company, 114 NLRB 765 (1955), enforced sub nom. N. L. R. B. v. Lewis, 246 F.2d 886 (9th Cir. 1957); International Paper Company, 150 NLRB 1252 (1965); Martin-Burns Sportables, Inc., 129 NLRB 364 (1969); Cf. N. L. R. B. v. Louisiana Bunkers, Inc., 409 F.2d 1295 (5th Cir. 1969).

4. While company president Wood did testify that at the time of the hearing his "guess" was that 190 to 195 employees were employed at San Lorenzo, he also further stated that he didn't "pay much attention to it . . . that's [Industrial Relations Manager] Leen's responsibility."

Mr. Leen did not testify to the number of workers employed at San Lorenzo.

In addition, the trial examiner found that in earlier dealings with the IAM the company had underestimated the number of employees at the San Francisco plant. Since there is no intimation in the record that the move to San Lorenzo involved a cutback, the trial examiner was reasonable in disregarding Wood's "guess" and concluding that the company employed approximately the same number at both locations. The trial examiner and the Board were therefore justified in using the figure of approximately 300 employees as the basis for evaluating whether the 85 IBEW employees were a substantial and representative complement.

the IBEW,[5] and to reimburse each of the present and former employees for all initiation fees, dues, and other moneys exacted pursuant to the union security agreement with IBEW.

## REFUSAL TO BARGAIN AT SAN LORENZO.

■ A more difficult question concerns the Board's finding of a further § 8(a)(5) violation in the company's refusing to bargain collectively with each of the unions at the relocated operation in San Lorenzo. It is now established[6] that the existence of such an unfair labor practice is dependent upon a finding that a majority of the unions' employees would have transferred to San Lorenzo and thus preserved the unions' majorities had it not been for the company's unfair labor practices.

The Board might well have been warranted in finding that a majority of the employees would have transferred had they been able to take the San Francisco contracts with them, since the large majority of the unions' employees indicated that they wished to transfer with all union rights and benefits. However, the only indication in the record of those willing to transfer without all their union rights were the 65 employees who actually made application at San Lorenzo.

The trial examiner's finding that a majority would have transferred was evidently based on the assumption that the company would have agreed to the transfers with full union rights had it bargained in good faith. We are unable to sustain such an assumption, since § 8(a)(5) only required the company to bargain in good faith about transfers, and the evidence makes it fairly certain that such bargaining would not have resulted in the company agreeing to transfers with full union rights intact.

We find an apt precedent for our disposition of this issue in Cooper Thermometer Company v. N.L.R.B., 376 F.2d 684 (2d Cir. 1967). There, the plant was moved 27 miles. The company agreed to negotiate severance pay with the union, saying it would supply applications to its present employees for jobs at the new location. It was adamant, however, that neither employment, seniority nor other benefits would transfer automatically and, in addition, denied the union's request for recognition at the new location.

The trial examiner concluded that, by failing to furnish the union with job data relating to the relocated operation (not charged in the instant case), refusing to negotiate concerning conditions of transfer, and insisting on dealing with employees on an individual basis, the company had violated § 8(a)(5). The Second Circuit, however, denied enforcement of that part of the Board's order that required Cooper to recognize the union at the new location, on the ground that the evidence did not fairly support a finding that a majority of the employees would have transferred to the new plant.

There, as here, a majority of the employees signed forms asking for "a transfer to the new location of the company . . . with full recognition of my seniority." After noting the fact that the signers had little to lose by offering to transfer on a condition they knew would not be met, the court concluded that that and several other factors raised a grave question about how seriously these letters could be taken. The court, however, found it unnecessary to decide that point,

"[S]ince § 8(a)(5) did not require Cooper to recognize the seniority of the [employees requesting transfer]; its duty was only to talk in good faith,

---

5. The order is without prejudice to any of the rights which the employees may have gained under the contracts.

6. California Footwear Company, *supra*; Cooper Thermometer Company v. NLRB, 160 NLRB 150, enforced in part 376 F.2d 684 (2d Cir. 1967); The Pierce Governor Company, Inc., 164 NLRB 97, affirmed sub nom. United Auto Workers v. N. L. R. B., 129 U.S.App.D.C. 282, 394 F.2d 757 (D.C.Cir.), cert. denied 393 U.S. 831, 89 S.Ct. 100, 21 L.Ed.2d 102 (1968).

and the evidence makes it fairly plain that such talk would not have that result." *Id.* at 689.

The trial examiner realized that he was bound by the Board's decision in *Cooper Thermometer;* however, he found "the instant record substantially more compelling in two critical respects: the strong evidence of the employees' desires, and the extent to which [the company] effectively prevented by its unfair labor practices the transfer of employees to the new plant."

We find the evidence of the employees' desires no more compelling here than in *Cooper Thermometer,* but there is merit in the second distinction made by the trial examiner. In our case the company, in addition to refusing to bargain about transfers, conditioned employment at the relocated plant on membership in IBEW, in violation of § 8(a)(3) and (2). Without doubt this condition could have had some effect on deterring employees from requesting a transfer.

■■ The record, however, does not support an inference that a majority of the employees would have transferred in the absence of required IBEW membership. The pay rates at San Lorenzo were lower, and no public transportation was available to San Lorenzo from San Francisco, where the majority of employees lived. In addition, of the 49 employees who were offered jobs, 14 declined out of dissatisfaction with the job offered. Since there is no basis in the record for the assumption that the company would have agreed to job continuity, it is not illogical to conclude that an equal percentage of any employees requesting transfer, would similarly have declined job offers. In light of these factors, we feel that there is insufficient affirmative evidence to sustain the finding that the absence of the union's majority status at the new plant has been caused by the company's unfair labor practices.

A factor influencing our decision is that the remedy fashioned by the Board in this case imposes on the 85 former IBEW workers at San Lorenzo a bargaining representative without reference to their choice. The right to choose a union is a cornerstone of the National Labor Relations Act. While we recognize that an infringement of the § 7 rights of the 85 employees might be justified in the face of a showing that substantial rights of the San Francisco employees were in the balance, as we have indicated above, we do not find such a showing in the record before us.

[9] Accordingly, we deny enforcement of so much of the Board's order that would require the company now to recognize the unions as representatives of their respective units at San Lorenzo. The Board, however, is not precluded from issuing any further order as to recognition that it may deem appropriate in light of the status of the parties after the company has made the reinstatement offer which the Board has required and which we here enforce.

REINSTATEMENT AND BACK PAY.

The Board required that the company offer the terminated employees immediate and full reinstatement to their former or substantially equivalent positions at the San Lorenzo plant without prejudice to their seniority or other rights or privileges, and make them whole for any loss of earnings. The company excepts to this order insofar as it requires them to replace existing employees, if necessary, and to make whole the terminated employees with back pay.

■■ The initial question that must be determined, however, is what pay scale will be applicable to the reinstated employees, for both back pay and reinstatement purposes. The company and the unions have been ordered to bargain in good faith over the transfer of the San Francisco employees. We think that the rate of pay should be that produced by this bargaining. The Board's remedy should restore "the situation, as nearly as possible, to that which would have obtained but for" the unfair labor practices. Phelps Dodge Corp. v. N.L.

R.B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

However, as the court stated in *Cooper Thermometer*,

"A sanction for refusal to bargain that would treat the guilty party as if he had agreed to what the other party demanded although the evidence shows he would have done nothing of the sort would give insufficient respect to Congress' direction in § 8(d) that the obligation to bargain 'does not compel either party to agree to a proposal or require the making of a concession.'" *Cooper, Thermometer, supra*, 376 F.2d at 690.

Section 10(c) empowers the Board, upon a finding that an unfair labor practice has been committed,

"to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act . . . ."

While we recognize that the Board's power is a broad discretionary one, subject to limited judicial review,[7] and that the "relation of remedy to policy is peculiarly a matter for administrative competence,"[8] we are nonetheless convinced that the Board's order does not effectuate the purposes of the Act as set forth in § 8(d). Accordingly we deny enforcement of so much of the Board's order as would require reinstatement and back pay based on the San Francisco contracts' scales of benefits and wages.

 We are in agreement with the Board that the company must replace existing employees, if necessary. The company's argument that such a remedy will punish innocent third parties who have been employed at San Lorenzo for up to three years overlooks the fact that the employees whom the company unlawfully ousted from their jobs were equally innocent. However, we do agree with the company that only those employees hired at San Lorenzo subsequent to April 30, 1969 should be subject to replacement.

The record clearly indicates that the company would not have agreed to displace the 85 employees formerly represented by IBEW, and we feel that the Board's order violates the policy of § 8(d) in ordering that those 85 employees be replaced if necessary.

Accordingly, we grant enforcement in part and deny it in part. The case is remanded to the Board for the issuance of a decree in accordance with this opinion.

---

7. N. L. R. B. v. Seven-up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

8. Phelps Dodge Corp. v. N. L. R. B., supra, 313 U.S. at 194, 61 S.Ct. at 852.