18 Mass. App. Ct. 371                              371

Board of Regents of Higher Education v. Labor Relations Commission.

BOARD OF REGENTS OF HIGHER EDUCATION; TRUSTEES OF THE
UNIVERSITY OF MASSACHUSETTS & another, interveners,[1] vs.
LABOR RELATIONS COMMISSION.

Suffolk.  March 19, 1984. — July 18, 1984.

Present: BROWN, DREBEN, & WARNER, JJ.

Labor, Collective bargaining, Board of Regents of Higher Education. *Board
    of Regents of Higher Education.  University of Massachusetts.  State
    College at Boston.*

Inasmuch as St. 1981, c. 808, providing for discontinuance of the State
    College at Boston, was intended as a legislative resolution of the rights
    of the College's faculty after discontinuance and a deliberate rejection
    of bargaining between the association representing the College's faculty
    and the Board of Regents of Higher Education, the Labor Relations
    Commission erred in requiring the Board of Regents to bargain with the
    association respecting the rights of its members after discontinuance.
    [375-377]

APPEAL from a decision of the Labor Relations Commission.

*Mark Peters* for Board of Regents of Higher Education.

*Joseph W. Ambash* (*William E. Searson, III, & Paul V.
Lyons* with him) for Trustees of the University of Mas-
sachusetts, intervener.

*Richard W. Coleman* for Massachusetts Society of Profes-
sors/Faculty Staff Union/MTA/NEA, intervener.

*Alan H. Shapiro* for Labor Relations Commission.

DREBEN, J.   Statute 1981, c. 808 (the Act), directed the
Board of Regents of Higher Education (Regents) to "discon-
tinue the state college at Boston" (College) and directed the
board of trustees of the University of Massachusetts (Univer-
sity) to provide a similar educational program. The Act also
referred to subsequent employment opportunities for the faculty

[1] Massachusetts Society of Professors/Faculty Staff Union/MTA/NEA.

of the College. The question before us is whether the Labor Relations Commission (Commission) was correct in interpreting c. 808 to allow bargaining over the continued employment of the College's faculty. The Commission held that such bargaining was mandatory and ordered the Regents to bargain with Massachusetts State College Association/MTA (Association), the employee organization representing the faculty and librarians[2] at the College, "over the methods and criteria for selecting which former Boston State College faculty/librarians and the number of such faculty to be employed at the University of Massachusetts, Boston."[3]

The Regents, the University,[4] and the union representing the faculty at the University, Massachusetts Society of Professors/Faculty Staff Union/MTA/NEA (Union), have all appealed. We conclude that even if there was an obligation prior to the Act to bargain about the number of the College's faculty who were to be employed at the University and the criteria for their selection, that duty no longer existed after the passage of c. 808. Accordingly, we reverse the order of the Commission.

There is no dispute as to the relevant facts, and the Commission disposed of the matter on affidavits and memoranda without hearing evidence. On July 14, 1981, the Regents voted to consolidate the College and the University and, as required by G. L. c. 15A, § 5(*b*), submitted a report to the Legislature.[5]

---

[2] The record does not indicate whether librarians as well as faculty are here involved, and we refer in this opinion to faculty as a shorthand expression.

[3] The Commission also ordered that until all such faculty "have been placed to the satisfaction of the Association," the Regents must, "[c]onsistent with the normal University hiring practices and any agreements reached between the Regents and the Association," give the former Boston State faculty "preference in the filling of . . . vacancies."

[4] Although the Commission has challenged the standing of the University on appeal, we need not reach this question, as all the issues necessary for our decision have been raised by parties whose standing has not been questioned.

[5] Section 5(*b*) imposes such a requirement when, among other changes, schools in the public system of higher education are consolidated or discontinued.

Shortly thereafter, the Association requested the Regents to bargain with it over the effects of consolidation. After rejecting a request of the Regents that there be coordinated bargaining with the faculty unions of other institutions, the Association bargained with the Regents from August 25, 1981, to November 23, 1981. Among the issues considered were the number of and the criteria under which the College's faculty members were to be employed at the University, as well as matters of tenure and seniority, the availability of employment at other State colleges, and which bargaining unit would represent the College's former employees. Prior to December 7, 1981, the date set for the next bargaining session, the parties agreed to suspend negotiations pending the outcome of a request by the Regents for a supplemental appropriation. The legislative response to that request was c. 808 of St. 1981.

Since we think that the bills preceding c. 808 place the actions of the parties, as well as the Act, in context, we briefly review them here. The first appropriation bill discussing the discontinuance of the College was 1981 Senate Doc. No. 2398, reported out of committee on November 25, 1981. That bill, in addition to directing the Regents to provide an appropriate plan for students of the College, required them to implement a plan for "the provision of employment opportunities at public institutions of higher education" for persons employed by the College; "provided, however, due consideration shall be given to the *integrity of academic and personnel policies and collective bargaining agreements at the employing institutions . . .*" (emphasis supplied).

The next legislative bill, 1981 House Doc. No. 7466, passed that chamber on December 18, 1981. It provided that employees of both the College and the University shall retain "all negotiated contract rights under their respective union contracts." The Regents were directed to initiate negotiations among the various institutions "and the appropriate bargaining units thereof" in order to reconcile conflicting terms of existing contracts. If agreement should not be reached by a certain date, the Regents were to file recommendations for a legislative solution. The Regents were also directed to give "due regard to existing negotiated employee rights to include tenure, rank, seniority, and salary."

On December 21, 1981, the Senate declined to concur in the House version and passed its own bill, 1981 Senate Doc. No. 2450. Instead of providing for bargaining by the Regents and the faculty unions, that bill contained a legislative resolution of the rights of the employees and their bargaining units. "Notwithstanding any other provision of law to the contrary," professional employees of the College "who are subsequently employed at another public institution of higher education with the approval" of the Regents shall be deemed to be members of the bargaining units, if any, of that other institution. The bill also gave the College's faculty certain seniority rights.

The House, in turn, declined to accept the Senate amendment, and the two versions went to conference on December 22, 1981. On January 5, 1982, the conference committee reported a bill (House Doc. No. 7479), which was passed by both chambers on that date.[6] The Act[7] retained the provisions of the Senate bill as to bargaining units and as to seniority, but, in addition, gave the faculty of the College two significant benefits: (1) tenured faculty of the College were to be given tenured offers; and (2) those professional employees of the College who were not subsequently employed at another public institution of higher education were to continue "to be deemed to be" paid employees of the Regents until June 30, 1982 (later extended to August 31, 1982, by reason of St. 1982 c. 241, § 26).

The Act, as well as the two bills which were sent to conference on December 22, 1981, called for discontinuance of the College by January 24, 1982. Recognizing the time pressures for implementing the program formerly provided by the College, and aware that it would require additional faculty, the University, on December 24, 1981, invited the College's faculty to apply for positions.[8]

---

[6] It was signed by the Governor on January 18, 1982.

[7] A portion of § 2, §§ 13-15, and a portion of § 16 of the Act are set forth in the appendix.

[8] Subsequently, the applications for teaching positions were reviewed in accordance with the University's hiring policies as contained in the Univer-

On January 7, 1982, two days after the legislation was passed by both Houses, the Association demanded a resumption of negotiations. When that demand was declined, the Association filed charges with the Commission. On January 29, 1982, the Commission issued a complaint of prohibited practice alleging that the Regents had violated G. L. c. 150E, § 10(*a*)(5), by refusing to bargain with the Association and had violated § 10(*a*)(1) in offering employment to the employees individually.

The Commission's final decision upheld the charges. Ruling that the Regents were required to bargain with the Association, the Commission, citing § 1 of c. 150E, treated the Regents as the common employer of the faculties of both the College and the University. Relying on Federal cases in the private sector, see e.g., *Cooper Thermometer Co.* v. *NLRB,* 376 F.2d 684, 688 (2d Cir. 1967); *Fraser & Johnston Co.* v. *NLRB,* 469 F.2d 1259, 1262-1263 (9th Cir. 1972); *NLRB* v. *National Car Rental Sys., Inc.,* 672 F.2d 1182, 1188 (3d Cir. 1982), the Commission viewed the discontinuance of the College as a move of one group of employees to another location of a single common employer. We think that analogy is not consonant with the express provisions of the Act.

The first two sentences of § 14, see Appendix, refer to faculty of the College "employed at another public institution of higher education with the approval of the board of regents." The role of the Regents is clearly limited. The power to appoint is left to each institution of higher education, while the Regents are merely to approve such appointments.[9] The vesting of approval but not appointment power in the Regents is consistent with a legislative sensitivity to the policy implications of imposing appointments on an institution of public higher education.

---

sity's manual and its collective bargaining agreement, and as of February 9, 1982, 146 former faculty members at the College had been hired, 133 with tenure.

[9] We assume, and the parties do not argue otherwise, that, unless the Regents have power to make such appointments, little purpose would be served by an order to bargain over the number and criteria of such appointments.

As noted earlier, the first Senate bill, 1981 Senate Doc. No. 2398, showed an awareness of the problem and required that "due consideration . . . be given to the integrity of academic and personnel policies . . . at the employing institution."

The limitation of the Regents' authority is also consonant with a specific Regents' policy, set forth in the margin,[10] of according to each institution of public education independence as to faculty appointments. We have no reason to assume that the Legislature, to whom the Regents submitted reports, see G. L. c. 15A, § 5(b), intended to negate such an explicit policy. Indeed, the Regents (and the University) urge that the establishment of criteria for hiring and tenure of University faculty is at the core of educational policy in maintaining a system of "public higher education of high quality." G. L. c. 15A, § 1, inserted by St. 1980, c. 329, § 112. For this reason, they urge, the number of College faculty to be hired by the University and the criteria for hiring are not mandatory subjects of bargaining. See, e.g., *Dennis-Yarmouth Regional Sch. Comm.* v. *Dennis Teachers Assn.,* 372 Mass. 116, 120 (1977); *School Comm. of West Bridgewater* v. *West Bridgewater Teachers' Assn.,* 372 Mass. 121, 122 (1977); *Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Assn.,* 375 Mass. 522, 526-527 (1978). In the view that we take of c. 808 we need not decide whether, in the absence of the Act, there would be a duty to bargain.

Also apparent in all the bills and in the Act is a legislative concern with the negotiated rights not only of the College faculty but also of the employees at the employing institutions. We note, in this connection, that the main contention of the Union (also joined in by the Regents and the University) is that the Commission's order impermissibly intrudes into the

---

[10] A May 12, 1981, "Statement of Policy" provides in relevant part: "Every decision to appoint, transfer, dismiss, promote, award tenure to, grant sabbaticals or leaves of absence or to take any other personnel action with respect to any member of the professional staff at any public institution of higher education shall be taken by the Board of Trustees of such institution subject only to any applicable policies promulgated by the Board of Regents."

· collective bargaining relationship between the Union and the University. The Union claims, with some plausibility, that its agreement contains comprehensive detailed criteria for the hiring of faculty at the University and places primary responsibility in the University faculty for initiating and recommending names for appointment. The imposition of any additional criteria, it urges, would conflict with that agreement. Cf. *General Warehouse & Helpers Local 767* v. *Standard Brands, Inc.,* 579 F.2d 1282, 1293-1294 (5th Cir. 1978), cert. dismissed, 441 U.S. 957 (1979); *International Assn. of Machinists* v. *Howmet Corp.,* 466 F.2d 1249, 1254-1255 (9th Cir. 1972).

Our reading of the statute does not require us to determine whether a duty to bargain about criteria would, of necessity, interfere with the Union's contract. Nevertheless, the serious possibility of conflict explicitly referred to in the legislation passed by the House (1981 House Doc. No. 7466), and the concern expressed in the Act, as well as in all the bills, for respecting the existing bargaining agreements at the institutions subsequently employing faculty members of the College, support our conclusion that c. 808 was intended as a legislative resolution of the rights of the College's faculty and a deliberate rejection of bargaining between the Association and the Regents.

Contrary to our reading, the Commission found the Act silent and concluded that it did not foreclose the Regents from bargaining with the Association over the number and criteria for selection of College faculty. Even were we to find the Act silent, as the Commission contends, the rejection by the Senate of the bargaining provisions of 1981 House Doc. No. 7466 and the ultimate passage of the conference committee bill which deleted those provisions provide a "cogent basis for rejecting the view" that the Legislature contemplated mandatory bargaining by the Regents and the Association. *Commonwealth* v. *Benoit,* 347 Mass. 1, 7 (1964). *Lexington* v. *Bedford,* 378 Mass. 562, 575 (1979).

The decision of the Commission is reversed, and the complaint is to be dismissed.

*So ordered.*

APPENDIX.

RELEVANT PROVISIONS OF ST. 1981, C. 808

"SECTION 2. . . . Item 1599-3277 For a reserve for the system of public institutions of higher education for the employment of the professional employees of Boston state college in accordance with section fourteen of this act, subject to the condition that the board of regents shall, within thirty days of employment of such persons, notify the house and senate committees on ways and means of the job title and employee number of each such person, the institution at which they have accepted employment, and any amounts expended for their continued employment

$3,700,000"

"SECTION 13. The board of regents of higher education is hereby directed to discontinue the state college at Boston no later than January twenty-fourth, nineteen hundred and eighty-two.

"SECTION 14. Notwithstanding any other provision of law to the contrary, professional employees (*a*) who were employed at Boston State College on December thirty-first, nineteen hundred and eighty-one (*b*) who are subsequently employed at another public institution of higher education with the approval of the board of regents of higher education, and (*c*) whose subsequent employment at said other institution becomes effective on or after the date on which said Boston State College is discontinued, shall be deemed to be members of such appropriate bargaining units, if any, as exist at said institutions on said date of discontinuance, or as may exist from time to time thereafter. Notwithstanding any other provision of law to the contrary, professional employees (*a*) who were employed at Boston State College on December thirty-first, nineteen hundred and eighty-one, and (*b*) who are not on said date of discontinuance employed at another public institution of higher education with the approval of the board of regents of higher education shall continue to be deemed to be employees of said board of regents until June thirtieth, nineteen hundred and eighty-two or until they are offered employment at another public institution of higher education, whichever is sooner; and said board of regents are hereby authorized and directed to expend such portion of the funds appropriated by item 1599-3277 of section two of this act as is necessary to continue the employment of said professional employees until they are all offered employment at another public institution of higher education or until June thirtieth, nineteen hundred and eighty-two, whichever is sooner. Each professional employee who, in accordance with this section, is employed at a public institution of higher education, other than any of the remaining nine state colleges, shall for the purposes of determining his seniority pursuant to any applicable collective bargaining agreement in force at said institution on the effective date of this act, be deemed to have the number of years of service that, on the afore-

said date of discontinuance, he then had for the purpose of determining his seniority pursuant to any collective bargaining agreement that was of application to him at Boston State College on the effective date of this act, but in no case shall such number of years of service exceed six. Each such public institution of higher education which offers employment to such professional employees under the provisions of this section shall offer tenure to those professional employees who had been awarded tenure at Boston State College on or before December thirty-first, nineteen hundred and eighty-one.

"SECTION 15. Upon the discontinuance of Boston State College by the board of regents, the board of trustees of the University of Massachusetts shall become the governing authority for the consolidated institution. Said board of trustees of the University of Massachusetts is authorized and directed to provide, at no expense to the commonwealth, a continuing education program similar to or the same as that formerly provided by Boston State College.

"SECTION 16. The board of regents is hereby directed to file, no later than June thirtieth, nineteen hundred and eighty-two, the following reports with the clerks of the senate and house of representatives who, with the approval of the president of the senate and speaker of the house of representatives, shall refer such reports to an appropriate committee of the general court:

"(*a*) A five year projection report for public higher education institutions in the Boston standard metropolitan statistical area, . . .;

"(*b*) The manner in which the education of the present students at Boston State College and the University of Massachusetts at Boston will continue without disruption;

". . . .

"(*d*) An inventory and utilization plan of and for public higher education facilities in the Boston standard metropolitan statistical area, including the utilization of the discontinued Boston State College, with specific consideration of possible collaborative agreements with public and private higher education and the Boston public school system.

"No plan adopted pursuant to this act shall be subject to the provisions of subsection (*b*) of section five of chapter fifteen A of the General Laws. Nothing in this act shall be deemed to prohibit the board of regents from discontinuing Boston State College prior to the date on which any plan or plans required to be adopted hereunder shall take effect."