CASCADE GENERAL,* Petitioner–Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.

Nos. 91–70547, 91–70605.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 1993.

Decided June 24, 1993.

As Amended Nov. 5, 1993.

---

* The Board's Motion to Correct Caption is granted. Thus, the entitled caption is hereby changed from "Cascade General, Inc." to "Cascade General."

Wayne D. Landsverk, Newcomb, Sabin, Schwartz & Landsverk, Portland, OR, for petitioner-respondent.

Fred L. Cornell, Jr., N.L.R.B., Washington, DC, for respondent-petitioner.

Before TANG, POOLE, and RYMER, Circuit Judges.

TANG, Circuit Judge:

Cascade General ("Cascade") petitions for review of a decision and order issued by the National Labor Relations Board ("Board"), and the Board cross-petitions for enforcement of its July 5, 1991 order. In its decision and order, the Board held that Cascade violated § 8(a)(1) and (2) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) and (2), by recognizing OCAW[1] as the collective bargaining representative at a time when Cascade did not employ a substantial and representative complement of the work force. The Board also ordered Cascade, among other things, to reimburse employees for all initiation fees, dues, and other moneys withheld and paid to OCAW. Cascade petitions for review arguing that it properly recognized OCAW as the collective bargaining representative. Cascade also argues that any initiation fees, dues, or other moneys withheld from its employees should be reimbursed by OCAW. We have jurisdiction under 29 U.S.C. § 160(e) and (f). We deny the petition for review and enforce the Board's order.

## BACKGROUND

Cascade General, a company engaged in the ship repair business, was formed in September of 1985 and is located in Vancouver, Washington. Cascade operated out of a 16,000 square feet facility which spread over two acres at the Columbia Industrial Park in Vancouver and was approximately six or seven miles away from Swan Island. On Swan Island, the Port of Portland company operated the Portland Ship Repair Yard—a major West Coast ship repair center. Cascade increasingly performed ship repair work at the Portland Ship Repair Yard. Cascade obtained work by submitting bids on ship repair projects. The amount of work force needed depended on the job's size and complexity. Some jobs produce short periods of work for a few, while other jobs produce long periods of work for hundreds of employees. Prior to July of 1987, Cascade experienced work force fluctuations ranging from a low of three to a high of over 200 employees.

Dillingham Ship Repair ("Dillingham"), a major competitor in the ship repair business, leased a 250,000 square-foot facility from the Port of Portland on Swan Island. Dillingham normally employed about 600 employees, but its work force fluctuated from a low of 10 to a high of 1700 employees. Of these employees, approximately 350 to 400 were represented by the Metal Trades Council of Portland & Vicinity, affiliated with the Pacific Coast Metal Trades Council ("MTC"). Prior to Dillingham's demise, Dillingham and MTC were negotiating over a new collective bargaining agreement. During this time, Michael Fahey, MTC Executive Secretary–Treasurer, orchestrated several protest demonstrations against Dillingham and became aware that some of Cascade's employees were MTC members. In desiring that MTC be the representative for Cascade's employees, Fahey met with Stephen Anderson, Cascade's president, and with William Lundmark, another Cascade official. Anderson requested Fahey to furnish a letter stated that they had met because such a letter would aid Cascade in obtaining work from ship owners. Fahey, on July 9, sent Cascade a letter stating that the parties met and are continuing to meet to pursue a labor agreement.

On June 30, 1987, no agreement between Dillingham and MTC was reached, and Dillingham went out of business. Its assets were put up for sale. Cascade submitted a bid of $1.2 million for Dillingham's assets. Also, sometime in mid-July, Cascade hired Loy Kahler as its executive vice president who later became Cascade's president. Kahler had served as a management official of Dillingham until April of 1987. Towards the end of July, Cascade was notified that it had submitted the winning bid. Cascade had put up $50,000 with its bid and agreed to obtain financing for the remaining balance by August 31, 1987.[2] In late July, Cascade project-

---

1. Oil, Chemical and Atomic Workers Local 1–369, AFL–CIO.

2. On August 31, 1987, Cascade obtained the necessary financing and purchased Dillingham's assets.

ed that the purchase of Dillingham's assets would enable it to expand its work force to 600 to 800 employees.

On July 27, 1987, Cascade was approached by OCAW. OCAW stated that it represented a "substantial majority" of Cascade's employees, and therefore, OCAW requested that it be recognized as the bargaining representative for Cascade's employees. A card check was conducted on July 31, 1987. At that time, there were sixteen employees, ten of whom signed cards indicating that they desired OCAW to be their bargaining representative. Also at that time, Cascade had employees in seven of its eleven job classifications. Thus, on July 31, 1987, Cascade recognized OCAW as the employees' exclusive bargaining agent. Also on July 31, Cascade wrote to the U.S. Navy requesting that it be placed on the Navy's list of bidders. The letter informed the Navy that Cascade recently purchased Dillingham's assets and that it will be located at the Dillingham facility on Swan Island. Shortly thereafter, Cascade notified Fahey that discussions between them was no longer possible because Cascade had recognized OCAW.

On August 28, 1987, Boilermakers Local 72 filed a representation petition. On September 1, 1987, MTC through Fahey also filed a petition seeking to have MTC certified as the bargaining representative for Cascade's employees. On September 9, 1987, Fahey sent Cascade a letter demanding that MTC be recognized as the bargaining representative. On that date, Fahey also filed an unfair labor practice charge against Cascade for prematurely recognizing OCAW as the bargaining representative. On September 24, 1987, Cascade and OCAW entered into a collective bargaining agreement. The agreement contained a union security clause and a check-off provision which required Cascade to withhold and remit to OCAW deductions from employees' wages for initiation fees and monthly dues. On November 28, 1990, an administrative law judge ("ALJ") found that Cascade violated the NLRA by recognizing OCAW as the bargaining representative. On July 5, 1991, the Board affirmed the ALJ on the grounds that Cascade recognized OCAW as the bargaining representative at a time when

Cascade did not employ a representative complement of employees. The Board also ordered Cascade to reimburse its employees for initiation fees and monthly dues withheld by Cascade and remitted to OCAW.

Cascade petitions for review of the Board's decision and order; the Board cross-petitions for enforcement of its order.

## DISCUSSION

### I.

■ We must uphold the Board's decision "if its factual findings are supported by substantial evidence and if it has correctly applied the law." *SKS Die Casting & Machining, Inc. v. NLRB*, 941 F.2d 984, 988 (9th Cir.1991) (quotation omitted). "If the Board's application of these findings is rational and consistent with the Act, the order is entitled to enforcement." *NLRB v. Pacific Erectors, Inc.*, 718 F.2d 1459, 1462 (9th Cir.1983).

### II.

■ An employer commits an unfair labor practice in violation of § 8(a)(1) and (2) of the NLRA, 29 U.S.C. § 158(a)(1) and (2), by recognizing a union as the collective bargaining representative and entering into a contract with such union at a time when the employer did not have a representative complement of employees. *NLRB v. Forest City/Dillon–Tecon Pacific*, 522 F.2d 1107, 1108 (9th Cir.1975).

"The determination of whether a 'full complement' exists involves striking a balance between the objective of allowing the maximum number of employees a voice in selecting their bargaining representative and the goal of assuring that the employees have representation as quickly as possible." *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 628 (9th Cir.1983). In other words:

The Board must often balance what are sometimes conflicting *desiderata*, the insurance of maximum employee participation in the selection of a bargaining agent, and permitting employees who wish to be represented as immediate representation as possible. Thus, it would unduly

frustrate existing employees' choice to delay selection of a bargaining representative for months or years until the very last employee is on board. Conversely, it would be pointless to hold an election for very few employees when in a relatively short period the employee complement is expected to multiply many times.

*Id.* n. 6 (quotation omitted).

Cascade argues that under *Hayes Coal Co.,* 197 N.L.R.B. 1162, 1163 (1972), the correct test for determining if it prematurely recognized OCAW as the bargaining representative is "whether, at the time of recognition, the jobs or job classifications designated for the operation involved are filled or substantially filled and the operation is in normal or substantially normal production." (Footnote omitted). Cascade alleges that at the time it recognized OCAW as the bargaining representative, Cascade was operating at normal productions: seven of its eleven job classifications were being utilized, and therefore, it properly recognized OCAW as the bargaining representative. We are not persuaded.

■ In determining whether a substantial and representative complement exists, the Board may also consider:

[T]he size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work ... as well as the relative certainty of the employer's expected expansion....

If a substantial increase in the size of the employee complement is expected with reasonable certainty in a relatively short time, a delay in counting the majority is appropriate.

*Premium Foods,* 709 F.2d at 628 (citations omitted); *see also, Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 48–49, 107 S.Ct. 2225, 2238–39, 96 L.Ed.2d 22 (1987).

Cascade argues that it is impossible to determine the number of employees it will have in the future because its work force fluctuates dramatically.[3] However, the

Board explicitly stated that its decision was not based on Cascade's "ability to predict accurately its future hiring levels, but on its plan—in existence at the time it recognized OCAW—to expand its operations to require, in normal times, levels of employment many times greater than the size of its work force at the time of recognition."

Cascade next argues that under *The Anaconda Company,* 225 N.L.R.B. 953 (1976), it is not unlawful to recognize a union as the bargaining representative in an expanding business at a time when its current work force is only a fraction of its projected work force. We disagree. Each case is balanced on its particular facts. *See Id.* at 955.

In this instance, Cascade's projected increase of its work force was at a much more accelerated rate than that in *Anaconda.* At the time Cascade recognized OCAW as the bargaining representative, Cascade had sixteen employees, ten of which signed authorization cards indicating that OCAW was the desired representative. However, Cascade knew that it would expand its current work force in the near future. That is, the Board specifically found that:

Respondent [Cascade] knew that its bid for the Dillingham assets had been accepted, and had reason to believe that it would reach a satisfactory lease arrangement with the Port for the Swan Island facilities previously occupied by Dillingham. The new assets, deployed in the Swan Island facilities, had by Kahler's admission supported a "normal" employment level in the hundreds. Moreover—again by Kahler's admission—it was necessary, and the Respondent planned, to expand its level of work and employment many times in order to pay off the loan for the newly purchased assets. By contrast, the amount of work justifying the low level of employment in late July would not even have generated enough revenue to pay the rent on the Respondent's then-existing facility, much less on the larger facilities on Swan Island which the Respondent planned to occupy. In these circumstances, even if the few

---

3. For example, prior to July of 1987, Cascade experienced work force fluctuations ranging

from a low of three employees to a high of 200+ employees.

individuals employed in late July represented many or even most of the crafts involves in ship repair, the level of employment at that time is incompatible with a finding that the Respondent was in substantially normal production, as that term would apply to its expanding operations.

■ The record clearly supports the Board's findings that Cascade expected with reasonable certainty that its work force would increase substantially within a short period of time. Cascade testified via its president, Mr. Kahler, that after the purchase of Dillingham's assets it projected a work force of 600 to 800 employees. Kahler further testified that Cascade had to hire 600 to 800 employees to make the mortgage payments on its $1.2 million financing of the Dillingham's assets purchase, and that Cascade intended to lease 249,000 square feet from the Port of Portland and to operate with as many employees it could sustain. Kahler then acknowledged that 600 to 800 employees was a reasonable number at which its leased facilities could sustain.

Because the Board's factual findings are supported by substantial evidence and it has correctly applied the law, we must uphold its decision. *See SKS Die Casting,* 941 F.2d at 988.

### III.

Cascade finally argues that even if it did violate the NLRA, it should not be required to reimburse union initiation fees, dues, and other moneys, because any such withholdings were paid over to OCAW. Cascade thus contends that any reimbursement should come from OCAW. We disagree.

■ "The Board has broad discretion in fashioning remedies to effectuate the policies of the Act in light of the circumstances of each case." *Industrial, Technical and Professional Employees Div., Nat'l Maritime Union v. NLRB,* 683 F.2d 305, 308 (9th Cir.1982) (citation omitted). We only have limited review over the Board's discretionary

power. *Id.* We "will overturn the Board's choice of a dues reimbursement remedy only where the reimbursement is shown to be punitive rather than compensatory or where the Board orders reimbursement absent a showing that employees were coerced in their choice of a bargaining representative." *Id.* (citation omitted).

In *Fraser & Johnston Co. v. NLRB,* 469 F.2d 1259 (9th Cir.1972), the Board found that the employer violated § 8(a)(2) by improperly recognizing a union as the bargaining representative at a time when the bargaining unit did not represent a substantial employee complement. *Id.* at 1263. The Board also found that the contract between the employer and the improperly recognized union contained "a union security provision requiring as a condition of employment membership in [such union] and payment to it of initiation fees and monthly dues." *Id.* There, we enforced the Board's order that the employer "reimburse each of the present and former employees for all initiation fees, dues, and other moneys exacted pursuant to the union security agreement." *Id.* at 1263–64.

The dissent takes the view that here, as in *Intalco Aluminum Corp. v. NLRB,* 417 F.2d 36 (9th Cir.1969), the Board's reimbursement order is punitive and not remedial because "there is no suggestion of company domination of the union or evidence of any act of coercion of the employees, except through the contract provisions for dues check-off." *Id.* at 42. This view is misplaced because the holding in *Intalco* was confined to its facts. *Id.* at 43 ("we conclude that under the circumstances of this case, the provisions for dues reimbursement is in fact a penalty and can not fairly be said 'to effectuate the purposes of the Act'"); *see also Sheraton–Kauai Corp. v. NLRB,* 429 F.2d 1352, 1358 n. 6 (9th Cir.1970) (limiting *Intalco* to its facts).[4]

The present case is distinguishable from the *Intalco* decision. Here, unlike in *Intalco,* Cascade recognized OCAW as the exclusive

---

4. The dissent also relies on *Kinney Nat'l Maintenance Serv. NLRB,* 81 L.R.R.M. 2733, 1972 WL 3066 (9th Cir.1972). Although in *Kinney* we denied to enforce the Board's order "insofar as the board would require reimbursement by the

company of the past checkoffs of dues," we did not lay out the facts of that case. Therefore, *Kinney* is not very helpful in determining whether the Board's reimbursement order here reasonably effectuates the policies of the NLRA.

bargaining representative at a time when Cascade knew it was going to expand its work force considerably in a short period of time, and there was no finding that Cascade acted in good faith by prematurely recognizing OCAW as the bargaining representative. Shortly thereafter, Cascade and OCAW entered into an agreement which required that all future employees become members of OCAW and be subject to a mandatory check-off dues security clause. As already stated, such conduct by Cascade was improper.

■ Under the circumstances of this case, the Board's order is rational in effectuating the policies of the NLRA and should be enforced. *See Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943) (Board's reimbursement order of the checked-off dues should stand "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act"). In this instance, as in *Virginia Electric,* we cannot say that the Board's order does not effectuate the policies of the NLRA. The Board's order required Cascade to reimburse its employees for initiation fees and dues, but the Board specifically noted that Cascade need not reimburse "any employees who voluntarily joined OCAW before September 24, 1987, the date the contract became effective." Reimbursement of money exacted from employees who did not freely choose OCAW as the bargaining representatives "promotes the policies of the National Labor Relations Act by assisting in completely disestablishing the illegally constituted union, severing its connection with the employer, restoring freedom of choice to the employee, and encouraging the employee to exercise his rights under the Act." *Id.* (citation omitted).

As in *Fraser,* Cascade violated § 8(a)(1) and (2) of the NLRA by prematurely recognizing OCAW as the bargaining representative and subsequently entering into a bargaining agreement with OCAW. The agreement contained a union security clause with a checked-off dues provision. Thus, all Cascade employees were required to be members of OCAW and Cascade was required to deduct and remit to OCAW initiation fees and monthly dues. We have held that the effect of this kind of agreement is to "taint the actions of the union and the employer in enrolling new employees in the union subsequent to the agreement date and in collecting fees and dues from them." *Forest City,* 522 F.2d at 1109. In essence, the employees were coerced to join the union. *See id.* (because the union security and checkoff agreements compelled new employees to join the union and pay fees and dues the employees were presumably coerced to join the union).

Contrary to the dissent's view, we do not hold that reimbursement is permitted in every case in which there is a union security clause. Our holding is limited to the particular facts involved in this case.

The petition for review is DENIED and the Board's order is ENFORCED.

RYMER, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues that there is substantial evidence in the record to support the National Labor Relations Board's conclusion that Cascade General's recognition of Local 1–369 of the Oil, Chemical & Atomic Workers (OCAW) violated the National Labor Relations Act. Therefore, I join Parts I and II of the majority opinion. However, because I believe that the dues reimbursement remedy imposed by the NLRB is a punitive measure that is beyond the Board's remedial powers, I dissent.

## I

The petitioner, Cascade General, is in the business of ship repair. Because this business depends on relatively short-term contracts for work on individual ships, employment levels in the industry fluctuate frequently. During the year prior to September 1, 1987, Cascade's payroll ranged from a low of three employees in September 1986 to a high of 118 employees in May 1987.

Before September 1, 1987, Cascade was a division of a Washington clothing store and was located in Vancouver, Washington, across the Columbia river from Portland, Oregon. Cascade did a substantial amount of work at the Port of Portland facility on

Swan Island. In mid–1987, a much larger competitor of Cascade located on Swan Island, Dillingham Ship Repair (DSR), went out of business. DSR's work force had fluctuated like that of Cascade, with an average of about 600 employees. During the last months of DSR's existence, it was involved in a dispute over the renewal of a labor contract with the Pacific Coast Metal Trades District Council (MTC), the union which represented its employees. The inability of DSR to resolve this dispute apparently contributed to its decision to cease operations.

The assets and inventory of DSR were put on sale, and in July 1987 Cascade learned that it had submitted the winning bid of $1.6 million. Cascade with some difficulties obtained financing for the purchase and negotiated a lease from the Port of Portland of most of DSR's former facilities on Swan Island. During the summer of 1987, Cascade hired several DSR management personnel, including Loy Kahler, who became president of Cascade in May 1988. On September 1, 1987, Cascade formally moved its operations to Swan Island in Portland and incorporated in Oregon.

After learning of its successful bid for the assets of DSR, Cascade applied on July 31, 1987 to be on the list of ship repair bidders of the Pacific Military Sealift Command of the United States Navy. Cascade's business increased substantially in size after the move to Swan Island on September 1, 1987. Cascade had its highest employment total ever of 193 employees during the week of September 6, 1987. Employment dropped to 63 by the end of September but increased to 285 by late October and 471 by the end of 1987. Kahler testified at the hearing in the present case that Cascade projected hiring 600 to 800 employees after purchasing the assets of DSR and that if Cascade's employment levels had not increased substantially, it would have had to liquidate the DSR assets.

Meanwhile, during the summer of 1987, Michael Fahey, executive secretary-treasurer of MTC, had several contacts with Cascade. In late June, Fahey met with Stephen Anderson, president of Cascade, and another Cascade official, William Lundmark. Anderson asked Fahey to provide a letter stating that MTC and Cascade had met, because such a letter would aid Cascade in obtaining work. On July 9, Fahey sent a letter to Anderson which stated that MTC would "continue to meet with Cascade General to pursue a mutual acceptable labor agreement between both parties." Fahey subsequently continued to maintain contact with Anderson.

On July 27, 1987, James Watts, president of the OCAW local, conducted a meeting with Cascade employees. At the end of the meeting, all ten employees present signed authorization cards selecting OCAW as their collective bargaining representative. On July 31, 1987, after a retired NLRB official conducted a card check and certified that the authorization cards represented a majority of Cascade's employees, Cascade recognized OCAW as the collective bargaining representative for its employees. There were sixteen employees on the Cascade payroll at the time the authorization cards were signed and eleven names were listed by management as "regular employees" at the time of the card check.

Cascade and OCAW reached a collective bargaining agreement which was unanimously ratified at a meeting of employees on September 24, 1987. The agreement contained a union security clause with a check-off provision, pursuant to which Cascade automatically deducted OCAW dues and initiation fees from employee paychecks and forwarded the funds to OCAW.

Anderson informed Fahey in late July 1987 that Cascade could no longer legally continue discussions with MTC. On August 28, 1987, Boilermakers Local 72 in Portland filed a representation petition with the NLRB to counter the recognition of OCAW. MTC filed a similar petition on September 1, 1987. On September 9, 1987, MTC initiated the instant litigation by filing a charge of unfair labor practices with the NLRB. The NLRB has pursued this litigation only against Cascade, and not against OCAW. Action on the two representation petitions has been delayed pending the resolution of the present case.

Since MTC and OCAW are both affiliated with the AFL–CIO, MTC also initiated proceedings under Article XX of the AFL–CIO Constitution. On April 28, 1988, the president of the AFL–CIO advised OCAW that its representation of the Cascade employees violated the AFL–CIO Constitution. After some efforts by OCAW to overturn this determination, OCAW on February 14, 1990 informed Cascade of its intention to cease acting as the bargaining representative of Cascade's employees.

## II

Cascade argues that it should not be required to reimburse OCAW dues and initiation fees to its employees because these dues were passed through to OCAW. Cascade points out that MTC could have filed an unfair labor practices charge against OCAW, but chose not to do so.

The authority of the NLRB to impose a dues reimbursement remedy was recognized by the Supreme Court in *Virginia Electric & Power Co. v. N.L.R.B.*, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). We set out a standard for imposing such a remedy in *Industrial, Technical & Professional Employees Div., Nat'l Maritime Union v. N.L.R.B. [National Maritime Union]*, 683 F.2d 305 (9th Cir.1982):

> The Board has broad discretion in fashioning remedies to effectuate the policies of the Act in light of the circumstances of each case. This discretionary power is subject only to limited judicial review. This court will overturn the Board's choice of a dues reimbursement remedy only where the reimbursement is shown to be punitive rather than compensatory or where the Board orders reimbursement absent a showing that employees were coerced in their choice of a bargaining representative.

*Id.* at 308 (citations omitted); *see also Morrison–Knudsen Co. v. N.L.R.B.*, 276 F.2d 63, 73–76 (9th Cir.1960), *cert. denied*, 366 U.S. 910, 81 S.Ct. 1082, 6 L.Ed.2d 233 (1961).

### A

A dues reimbursement remedy must be overturned under *National Maritime Union* if the remedy "is shown to be punitive rather than compensatory." 683 F.2d at 308. Courts have denied dues reimbursement where it will result in a windfall for employees and an unfair penalty for an employer which has passed the dues on to a union.

In *Kinney Nat'l Maintenance Serv. v. N.L.R.B.*, 81 L.R.R.M. 2733, 1972 WL 3066 (9th Cir.1972), we rejected "reimbursement by the company of the past checkoffs of dues for the reason that we do not believe the purposes of the act would be served by compelling the company to, in effect, pay dues twice." 81 L.R.R.M. at 2733. The Third Circuit stated in *N.L.R.B. v. Mears*, 437 F.2d 502 (3d Cir.1970) that where

> the general counsel [of the N.L.R.B.] has chosen not to make the [union] a respondent, ... the effect of enforcement of the reimbursement order will be to require a second payment by the employer-respondent[ ] while the beneficiary of ... assistance gets a windfall.

*Id.* at 513; *see also Hughes & Hatcher, Inc. v. N.L.R.B.*, 393 F.2d 557, 568 (6th Cir.1968) ("If [the employer] has paid the moneys to [the union], then the Board's order should be directed against that union and not against [the employer].").

Similarly, in the present case the remedy directed solely against Cascade is punitive. First, Cascade paid the dues which it collected to OCAW. As in *Kinney* and *Mears*, the NLRB would require Cascade to reimburse funds which it did not retain. The NLRB argues that *Kinney, Mears*, and *Hughes & Hatcher* are distinguishable on the ground that the NLRB had no authority to file a complaint against OCAW under § 10(b) of the NLRA, 29 U.S.C. § 160(b), because no unfair labor practices charge was ever filed against OCAW. *See Radio Officers' Union v. N.L.R.B.*, 347 U.S. 17, 53, 74 S.Ct. 323, 342, 98 L.Ed. 455 (1954). However, contrary to the NLRB's argument, this distinguishing factor provides an additional basis for denying dues reimbursement in this case. The fact that it was MTC, rather than the NLRB, which chose not to pursue the present litiga-

tion against OCAW [1] makes it doubly unfair for the employees on whose behalf MTC was acting to recover dues which had been paid to OCAW.

Second, there is no evidence that Cascade employees received ineffective representation from OCAW and were thus unfairly deprived of their dues. This case is unlike *Virginia Electric*, where the union in question was "an illegal organization which foreclosed [employees'] rights to freedom of organization and collective bargaining." 319 U.S. at 540, 63 S.Ct. at 1218–19. Cascade employees unanimously approved the collective bargaining agreement negotiated by OCAW.

Finally, there is no evidence in the record of knowingly culpable conduct by Cascade in the recognition of OCAW. The demand for recognition of OCAW was initiated not by Cascade but by Watts, the president of the OCAW local. Although Cascade had been dealing with Fahey, the executive secretary-treasurer of MTC, at the time of the OCAW recognition and was thus aware of MTC's interest in organizing at Cascade, there is no evidence that Cascade did anything to impede recognition of MTC. The ALJ found that Stephen Anderson, the president of Cascade, "executed a recognition statement to OCAW without having any particular reason to do so." However, this evidence shows at most that Cascade preferred OCAW as a bargaining representative to MTC, which is certainly not illegal. Moreover, although Cascade had plans of expansion, it was engaged in substantially normal operations and its job classifications were substantially filled when it recognized OCAW, making it a close call whether Cascade's actions were illegal at all. *See Premium Foods, Inc. v. N.L.R.B.*, 709 F.2d 623, 628 (9th Cir.1983).

A lack of culpable conduct by Cascade is entirely consistent with our decision today that Cascade engaged in an unfair labor practice. Recognition of a non-majority union, including premature recognition in a growing bargaining unit, is illegal "even though done in the good-faith belief that the union had the consent of a majority of em-

ployees...." *International Ladies' Garment Workers' Union v. N.L.R.B.*, 366 U.S. 731, 732, 81 S.Ct. 1603, 1604, 6 L.Ed.2d 762 (1961). Under the present circumstances, the NLRB's remedial order does not right any wrong or compensate any loss, but merely punishes Cascade for its mistakenly improper conduct.

**B**

The decisions on which the majority relies, *N.L.R.B. v. Forest City/Dillon–Tecon Pacific*, 522 F.2d 1107 (9th Cir.1975) and *Fraser & Johnston Co. v. N.L.R.B.*, 469 F.2d 1259 (9th Cir.1972), are not persuasive that dues reimbursement is permitted merely because there is a union security clause. The majority is correct that a union security clause may constitute the coercion which is required for dues reimbursement. *See Forest City*, 522 F.2d at 1109; *Sheraton–Kauai Corp. v. N.L.R.B.*, 429 F.2d 1352, 1357 (9th Cir.1970); *N.L.R.B. v. Jan Power, Inc.*, 421 F.2d 1058, 1063–64 (9th Cir.1970). However, our decision in *National Maritime Union* specifies both coercion by the employer and a remedial purpose on behalf of the NLRB as prerequisites for dues reimbursement. 683 F.2d at 308.

In *Intalco Aluminum Corp. v. N.L.R.B.*, 417 F.2d 36 (9th Cir.1969), we rejected an order of dues reimbursement where "there [was] no suggestion of company domination of the union or evidence of any act of coercion of the employees, except through the contract provisions for dues check-off." *Id.* at 42. Subsequently, in *Kinney*, we again rejected a dues reimbursement remedy imposed in a case involving a contract with a check-off provision. 81 L.R.R.M. at 2733. In the present case, the NLRB's dues reimbursement order is likewise improper because it is punitive in nature.

In both of the decisions cited by the majority, there was a basis for finding a remedial purpose for the Board's dues reimbursement order. The parties in *Forest City* did not contest that the employer's conduct violated

---

1. MTC did proceed against OCAW under the AFL–CIO Constitution. This separate proceeding suggests that MTC's decision not to file an NLRB charge against OCAW was not unintentional.

the NLRA. 522 F.2d at 1108.[2] The present case is a much closer call, and the record fails to disclose any knowingly culpable conduct by Cascade. In *Fraser & Johnston,* the employer failed to bargain in good faith. 469 F.2d at 1262–63. There is no evidence of such knowingly improper conduct in the present case.

### III

I am mindful of the broad remedial powers of the NLRB. The Supreme Court has interpreted the NLRA "as vesting in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policy of the Act, subject only to limited judicial review." *Sure–Tan, Inc. v. N.L.R.B.,* 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812–13, 81 L.Ed.2d 732 (1984). However, in *Premium Foods* we explicitly held that the NLRB exceeds its broad remedial powers when it chooses a dues reimbursement remedy that is punitive rather than compensatory. Therefore, I respectfully dissent.

---

**2.** The employer contended only that it fell within an exception to the NLRA. *Forest City,* 522 F.2d at 1108. The court rejected that contention. *Id.* at 1109.